## Armstrong School District *v.* Armstrong Education Association, et al.

Argued February 23, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*William K. Eckel,* with him *Caram J. Abood* and *Green, Gibson & Abood,* for appellants.

*Robert E. Pryde,* for appellee.

OPINION BY JUDGE BLATT, May 17, 1972:

This is an appeal from an Order of the Court of Common Pleas of Armstrong County enjoining the appellant, the Armstrong Education Association ("Association"), from continuing to engage in a strike against the appellee, the Armstrong School District ("District"). The District has approximately 12,000 students, and it employs approximately 550 teachers, for whom the Association is the certified bargaining agent. Since December, 1970, the District and the Association have been engaged in negotiations in an effort

to arrive at a collective bargaining agreement for the 1971-1972 school year.

In their negotiations, the parties followed the procedures outlined in the Public Employe Relations Act, Act of July 23, 1970, P. L. 563, No. 195, 43 P.S. §1101.-101, et seq. (hereinafter "Act No. 195"), but they reached an impasse. In an effort to resolve this impasse, Association members began a strike against the District on April 27, 1971, and, in response to a complaint in equity filed on behalf of the District, the Court of Common Pleas of Armstrong County enjoined the strike on May 11, 1971, and ordered the teachers back to work. The teachers obeyed this Order and returned to work, finishing out the school year of 1970-1971.

Although negotiations continued, no agreement was reached and the teachers went out on strike again on August 30, 1971, just as the 1971-1972 school year was about to begin. Another complaint in equity was filed on behalf of the District, contending that the strike created "a clear and present danger or threat to the health, safety or welfare of the public," thus bringing the matter within the provisions of Section 1003 of Act No. 195, 43 P.S. §1101.1003, and making it ripe for injunctive relief. Hearings were held by the Court of Common Pleas on September 1 and September 14, 1971, and the testimony at these hearings was substantially as follows:

The District Superintendent testified that the District was required to supply 180 instructional days prior to June 30, 1972 or be in danger of losing state subsidies, and that, with the school year scheduled to end on June 2, 1972, there might not be enough days remaining before June 30 to make up the time lost because of the strike.

The Assistant Superintendent testified that the strike had caused the cancellation of all extracurricular

activities and varsity sports, and that, if permitted to continue, it would interfere with arrangements for "in-service days", which the District considered valuable for the teachers.

The testimony of the District Supervisor of Child Services was to the effect that a continuation of the strike would cause difficulties in obtaining qualified school bus drivers, and would bring about other problems concerning pupil transportation.

The Superintendent of Public Affairs testified that the strike had caused an interruption in his routine office procedures and that the negotiations had consumed so much of his time that a considerable backlog in his work was resulting.

The President of the School Board testified to several instances in which she and other Directors had been harassed by picketing and other disturbances at their homes and by the receipt of numerous unpleasant phone calls. She also testified as to the disorderly atmosphere in which a recent School Board meeting had been conducted, and as to the need for sheriff's deputies to be called in to keep order at the meeting. She at no time stated, however, that the matters complained of had been caused by Association members; in a few instances, she specifically denied that any teachers had been involved.

Following the September 1 hearing, the Court denied the request for an injunction on the ground that it was premature, but, following the September 14 hearing, the Court issued the requested injunction, finding that a clear and present danger or threat to the health, safety or welfare of the public existed. Such a finding was based on the strained atmosphere in the community as evidenced by the harassment of School Board Directors and of the Judge, and on the fact that 12 days of school, which would have to be made up, had already been lost.

The teachers were ordered back to work as of September 15, 1971. It is from this injunction that the Association has appealed.

In reviewing the lower court's action in issuing an injunction, our scope of review, as with other types of equity matters, is limited, " '(W)e will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable: . . .' Lindenfelser v. Lindenfelser, 385 Pa. 342, 343-344, 123 A. 2d 626, 627 (1956) ; United Natural Gas Co. v. Wagner, 417 Pa. 456, 208 A. 2d 843 (1965) ; Alabama Binder & Chemical Corp. v. Pennsylvania Industrial Chemical Corp., 410 Pa. 214, 189 A. 2d 180 (1963)." *Community Sports, Inc. v. Denver Ringsby Rockets, Inc.*, 429 Pa. 565, 569, 240 A. 2d 832, 834 (1968).

It was long the law in almost all jurisdictions that strikes by public employees were illegal, and Pennsylvania was no exception to this rule.[1] The last decade, however, has brought a tremendous increase in the unionization of public employees and a corresponding increase in illegal strikes by these employees,[2] who claim to have found their remedies under the law inadequate. The leaders in this new militancy, perhaps with good reason, have often been school teachers.

In order to deal with the problem of public employee labor relations, the Legislature in 1970 enacted Act No. 195. This Act explicitly recognized the right of public employees to organize and to bargain collec-

---

[1] Act of June 30, 1947, P. L. 1183, §2, now repealed.

[2] During the years 1963-1965 there were 112 strikes involving 50,000 public employees. In 1969 alone, there were 414 strikes involving 161,000 public employees. Comment, *Public Employees: No Right To Strike*, 38 Tenn. L. Rev. 403, 410 (1971).

tively, and it also established specific procedures for collective bargaining which were intended to lessen the possibility of the development of an impasse. The Act provided, however, that if all the procedures have been complied with, and yet an impasse has developed, the right of the employees to strike must be recognized. The public employer is then given the right to seek equitable relief, including injunctions, in the court of common pleas of the jurisdiction where the strike occurs. Section 1003 of Act No. 195 provides, however, that an injunction may not issue unless ". . . the court finds that the strike creates a clear and present danger or threat to the health, safety or welfare of the public."

The determination of what is a "clear and present" danger under Act No. 195 presents some problems. The phrase has almost invariably been used heretofore in cases involving government interference with First Amendment rights. *See, Dennis v. United States,* 341 U.S. 494, 71 S. Ct. 857, 95 L. Ed. 1137 (1951); *Terminiello v. City of Chicago,* 337 U.S. 1, 69 S. Ct. 894, 93 L. Ed. 1131 (1949); *Schenk v. United States,* 249 U.S. 47, 39 S. Ct. 247, 63 L. Ed. 470 (1919). A definition of the term, however, which seems to be applicable here was stated in *Communist Party of the United States v. Subversive Activities Control Board,* 223 F. 2d 531 (D.C. Cir. 1954), reversed on other grounds, 351 U.S. 115, 76 S. Ct. 663, 100 L. Ed. 1003 (1956), as follows: "The 'clear' in that epigram is not limited to a threat indubitably etched in every microscopic detail. It includes that which is not speculative but real, not imagined but actual. The 'present' in the epigram is not restricted to the climactically imminent. It includes that which exists as contrasted with that which does not yet exist and that which has ceased to exist." 223 F. 2d at 544. In this light, the determination of whether or not a strike presents a clear and present dan-

ger to the health, safety or welfare of the public must, therefore, require the court to find that the danger or threat is real or actual and that a strong likelihood exists that it will occur. Additionally, it seems to us that the "danger" or "threat" concerned must not be one which is normally incident to a strike by public employees. By enacting Act No. 195 which authorizes such strikes, the Legislature may be understood to have indicated its willingness to accept certain inconveniences, for such are inevitable, but it obviously intended to draw the line at those which pose a danger to the public health, safety or welfare.[3]

The reasons indicated by the court for granting the injunction here fall generally into three categories: (a) the disruption of routine procedures; (b) the harassment of School Board Directors; and (c) the danger of losing state subsidies because of the inability of the District to provide the full schedule of 180 instructional days.

---

[3] "A strike by teachers . . . might be tolerated for an extended period of time before it could be demonstrated that continuation of the strike would constitute a similar threat [of danger to the public]. Teachers are customarily absent from their classrooms during weekends and holidays. Perhaps more significant is the fact that teacher services can be suspended for three months during the summer without any apparent adverse effect on the public welfare. The contrast between employment which normally involves such interruptions in service, and the necessity of continuous service by policemen, dramatizes the reason that the tolerance level for work stoppages differs so markedly.

"Although it has been suggested that a teacher strike might never create an immediate threat to public welfare, a court could conceivably find such a threat where a teacher strike continued for so long that make-up classes would not be feasible before a new school term would begin, or perhaps when the remaining vacation time for make-up classes becomes very short." Note, *Striking a Balance in Bargaining with Public School Teachers*, 56 Iowa L. Rev. 598, 610-611 (1971).

The disruption and the harassment were certainly "clear and present", but they did not constitute a "danger" or "threat" as envisaged by Act No. 195. On the other hand, the loss of school subsidies was a "danger", but it was not, at least not yet, "clear and present".

The disruption of routine administrative procedures, the cancellation of extracurricular activities and sports and other such difficulties are most certainly inconvenient for the public, and especially for students and their parents. But these problems are inherent in the very nature of any strike by school teachers. If we were to say that such inconveniences, which necessarily accompany any strike by school teachers from its very inception, are proper grounds for enjoining such a strike, we would in fact be nullifying the right to strike granted to school teachers by the legislature in Act No. 195.

A more serious problem is raised by the community unrest and the harassment of public officials which have apparently occurred in reaction to the strike. The testimony gives no indication as to who has been involved in these incidents, although it was made clear as to some situations that the Association's members were *not* so involved. We deplore such activities and sympathize with the lower court's wish to bring them to an end. Enjoining the strike, however, was not a proper method of accomplishing this purpose. In this situation it does not seem to be the strike which was the "danger" to the public, but the reaction to it by persons unknown. We cannot find that Section 1003 of Act No. 195 was intended to permit striking employees to be penalized by having their strike enjoined because a number of citizens oppose their stand and choose to show this by disrupting the community. There are other laws available to deal with such disorders.

The danger that the District will lose state subsidies because of a strike would be proper grounds for

enjoining the strike if such danger were "clear and present". And, although it is not certain that subsidies will in fact have to be withheld because of the strike, it is a possibility which cannot be ignored. If the strike lasted so long, therefore, that any continuation would make it unlikely that enough days would be available to make up the 180 required, the teachers could be properly enjoined from continuing it. At the time of the last hearing, however, the strike had lasted only 12 days, and the District had 20 days available in June plus 19 holiday dates which could be used to make up time lost. The possibility that the strike would extend longer than the make-up time available did not yet exist. If a strike is to be enjoined on the basis that insufficient make-up time actually will exist, the strike must at the very least have reached the point where its continuation would make it either clearly impossible or extremely difficult for the District to make up enough instructional days to meet the subsidy requirement within the time available. This strike was far from that point when the Court below enjoined it. The fact that students and teachers might have to remain in school later in June than originally planned may be unfortunate, of course, but again it is merely an inconvenience inherent in the right of school teachers to strike, a right now guaranteed them by the law.

We must hold that at the time this injunction was issued, there were no reasonable grounds on which the lower court could find that the strike by the Association was a "clear and present danger or threat to the health, safety or welfare of the public." This is not to say, of course, that public employees may strike with impunity and ignore the public interest, nor that such inconveniences as those noted herein as incidental to a strike might not conceivably accumulate to such an extent, be continued so long or be aggravated by some

unexpected development, so that the public health, safety and welfare would in fact then be endangered. We must hold, however, that the proper purpose of an injunction under Act No. 195 is to avert present danger, **not to prevent danger which may** never occur at all or which can only occur, if it does occur, at some future time before which the grievances concerned can reasonably be expected to be settled.

For the reasons stated, the order of the lower court is reversed and the injunction is hereby dissolved.

