Bristol Township Education Association, Appellant, *v.* School District of Bristol Township, Appellee.

464

Argued April 3, 1974, before President Judge Bow-
MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON,
JR., MENCER, ROGERS and BLATT.

*John F. X. Fenerty,* with him *Charleston & Fenerty, P.C.,* for appellants.

*George T. Kelton,* with him *Edwin N. Popkin* and *Begley, Carlin, Mandio, Kelton and Popkin,* for appellee.

OPINION BY JUDGE BLATT, July 23, 1974:

The Bristol Township Education Association (appellant) has appealed from the issuance of an injunction pursuant to Section 1003 of the Public Employe Relations Act, Act of July 23, 1970, P. L. 563, 43 P.S. §1101. 1003 (PERA) enjoining the appellant from any further strike or work stoppage against the School District of Bristol Township (appellee).

Without reciting the entire procedural history of this case, we will merely note that its major procedural complexities have been previously argued before this Court and that orders have already been issued denying a motion to quash and declaring that this appeal did in itself not operate as a supersedeas without an approved security.

The case is before us now on its merits, and our scope of review is limited to determining whether or not apparently reasonable grounds existed for the equitable relief ordered by the lower court and, unless it is plain that no such grounds existed or that the rules of law relied on were palpably wrong or clearly inapplicable, we must affirm. *Armstrong School District v. Armstrong Education Association,* 5 Pa. Commonwealth Ct. 378, 291 A. 2d 120 (1972) (*Armstrong I*).

We find that the injunction was properly issued.

The language of Section 1003 of the PERA, 43 P.S. §1101.1003, provides: "If a strike by public employes

occurs after the collective bargaining processes set forth in sections 801 and 802 of Article VIII of this act have been completely utilized and exhausted, it shall not be prohibited unless or until such a strike creates a *clear and present danger or threat to the health, safety or welfare of the public.* In such cases the public employer shall initiate, in the court of common pleas of the jurisdiction where such strike occurs, an action for *equitable relief including but not limited to appropriate injunctions* and shall be entitled to such relief if the court finds that the strike creates a clear and present danger or threat to the health, safety or welfare of the public." (Emphasis added.)

The body of law which has been developed in this area requires adherence to several basic principles: (1) teachers shall not be prohibited from striking if an impasse occurs after the statutory negotiation and mediation procedures have been completed; (2) equitable relief may be employed to halt a lawful strike only if the strike creates a clear and present danger or threat to the health, safety or welfare of the public; (3) this clear and present danger test does not contemplate a consideration of those effects which are normally incident to a strike unless such matters accumulate to such an extent, be continued so long or be aggravated by some unexpected development so that the public health, safety and welfare would in fact then be endangered. *Armstrong I, supra;* and (4) the possibility of dangerous effects of the strike may be considered in assessing its impact. *Bellefonte Area School Board v. The Bellefonte Education Association,* 9 Pa. Commonwealth Ct. 210, 304 A. 2d 922 (1973).

Although the above criteria should be strictly applied, we may not apply such criteria directly to the testimony as a whole, but only to the findings of the Chancellor, if such findings are supported by sufficient evidence. Even if, in our view, a preponderance of tes-

timony should exist against a finding or a reasonable inference by the Chancellor, we must not overturn his findings or inferences if there is any testimony which, if believed, will warrant them. *Ross v. Philadelphia Federation of Teachers,* 8 Pa. Commonwealth Ct. 204, 301 A. 2d 405 (1973).

The Chancellor found that the following facts justified the issuance of the injunction: (1) many of the students, who comprise approximately 20% of the Township population, are being denied complete educational programs; (2) working mothers, who may have school-age children, are injuriously affected by the strike; (3) 26 student days have been lost because of the strike and only 23 possible make-up instructional student days remain before the end of the fiscal year on June 30, 1974; (4) "[a] partial loss of state reimbursement—a substantial sum . . . is suffered by a district for failure to comply with state requirements";[1] (5) cafeteria workers and bus drivers have lost wages; (6) special education and training programs for most of the mentally retarded, brain injured and socially and emotionally disturbed students are not being conducted; (7) there is a likelihood that the nonattendance of college-bound high school seniors will work to their disadvantage in College admission; (8) county services are unavailable for students with hearing, vision or speech disabilities; and (9) extra-curricular activities are not in operation.

In addition, the Chancellor found further justification for his injunction in that the following community programs have been inoperative because of the strike; (10) driver education; (11) a community swim pro-

---

[1] In his discussion, the Chancellor said directly that "[t]here is now no possibility of the District's fulfilling the mandate of the School Code that there shall be at least 180 days of school by June 30, 1974, the end of the fiscal year. School subsidies will most probably be lost as a direct result of this situation."

gram which involves life-saving courses and rescue squad practice; (12) adult education for basic subjects and citizenship training, high school instruction and enrichment education; (13) a cooperative work experience program; (14) the only driver improvement program in the lower Bucks County (for retention of operating privileges upon accumulation of points); (15) federally funded "Itinerant teachers" programs; (16) social worker programs; and (17) free lunch programs.

The testimony presented by the appellee, although it was disputed and at times contradicted by the appellant, substantially supports these findings and was apparently believed by the Chancellor. We are, therefore, bound by these facts. We must further consider, however, if such facts would support the issuance of an injunction.

As to the potential loss of state subsidies because of the failure of the schools to operate for the required time, this is, of course, an important factor to be considered in the overall assessment of the effects of such a strike. In *Root v. Northern Cambria School District*, 10 Pa. Commonwealth Ct. 174, 181, 309 A. 2d 175, 178 (1974), we said, "[t]he loss of any money needed to support the schools, especially those closed by labor troubles, is clearly a threat to the general welfare and, as Armstrong suggests, *could* compel injunctive relief." (Emphasis added.) This does not mean, of course, that the Legislature intended to put a limit on the number of days that a strike might last. Nor does it mean that the mere loss or threatened loss of subsidies is alone sufficient to warrant the enjoining of the strike. It is also necessary to establish that the loss of such subsidies would present a danger or threat to the health, safety or welfare of the public. Here the Chancellor specifically found, on the basis of sufficient evidence, that the appellee would be unable to make up all the days lost by the strike and that a continuation of the strike would

further aggravate the situation. The subsidy could be lost for the days not made up and there was evidence offered as to the effect of such a possibility. The Chancellor weighed this evidence, as was his responsibility, and determined that the threatened loss of the subsidies would constitute a danger which required that the strike be enjoined. We cannot hold that he erred in so finding.

As to the other findings made by the Chancellor, we cannot hold that any of them taken alone or considered together would *necessarily* constitute a basis for the injunction issued herein. All are inconveniences which the Legislature could reasonably have expected would ordinarily occur as the result of a strike by school teachers. This is not to say, however, as we noted in *Armstrong I*, "that such inconveniences . . . incidental to a strike might not conceivably accumulate to such an extent, be continued so long or be aggravated by some unexpected development, so that the public health, safety and welfare would in fact then be endangered." 5 Pa. Commonwealth Ct. at 386-387, 291 A. 2d at 125. Here the strike has lasted for 26 days and it would not necessarily have been unreasonable for the Chancellor to find that some of the above noted inconveniences had accumulated or been aggravated to such an extent as to warrant the issuance of an injunction. Even as to the community-wide programs, those not involved only with the schools or the educational process, the cumulative and extended loss of such programs (i.e., programs for social workers and "Itinerant teachers," the work experience program, the driver improvement program, etc.) could have a detrimental effect on the welfare of the community as a whole. *See Ross, supra.* Under the circumstances here, therefore, the court below had sufficient grounds for issuing an injunction.

Even recognizing the propriety of the issuance of the injunction under the facts as found by the Chancel-

lor, however, its scope must still be reviewed. The appellant contends that the Chancellor exceeded his jurisdiction by imposing a "judicially created contract" on the parties and further erred in failing to mandate "adherence to the legislative minimums." Common pleas courts have limited equity jurisdiction in these matters, and may act only to end a strike, not to impose any judicial settlement thereon. *Armstrong School District v. Armstrong Education Association*, 5 Pa. Commonwealth Ct. 387, 291 A. 2d 125 (1972). (*Armstrong II*). Here the Chancellor ordered that the "employes shall return to duty under terms and conditions of employment contained in the last bilaterally, voluntarily assented-to contract between the parties." Most importantly, however, the Chancellor added that the mutually agreed upon changes to that contract should be heeded by the parties. The parties were directed to proceed with negotiations and, of course, any resolution by them would not be interfered with by the court. We cannot hold that this was an attempt by the Chancellor to impose a forced permanent settlement. It was, we believe, merely the provision for "the orderly resumption of the employer-employe relationship upon the return of the teachers and professional employes to their respective duties." Such an order is realistic and necessary for the ending of a strike, and it provides a basis upon which the teachers could return to work. We note, however, that it may be mere surplusage. Even without such an order, the teachers would still have returned to work under conditions existing immediately prior to the inception of the strike.

The Chancellor's order also provides "that the Plaintiff shall have the absolute right to implement its proposed revised scheduling of classes and teacher assignments for the 1973-74 school year until such time as the same is changed by mutual agreement." Here we believe that the Chancellor did seek to impose a con-

dition on the parties which had not been previously in effect or subsequently mutually agreed to, and we believe that this is beyond the Chancellor's powers. It might well be that the appellee would have the authority to take this action on its own, because as we said in *Root, supra,* "[t]he Legislature's direction that schools shall be kept open 180 days of course means that *school boards shall schedule and attempt to provide* for school sessions of this duration." (Emphasis added.) 10 Pa. Commonwealth Ct. at 179, 309 A. 2d at 177. The discretion in this difficult scheduling matter, however, is not within the jurisdiction of the Chancellor in this particular proceeding.

For the above stated reasons, we affirm the order of the Chancellor, but we do so only to the extent that it enjoins the continuation of the strike and provides for a return to work under previously existing conditions or as modified by mutually agreed upon changes thereto.

---

DISSENTING OPINION BY JUDGE MENCER:

I respectfully dissent. I believe that by this affirmance the majority has almost equated the inability of a school district to offer 180 days of instruction in each school year, because of a teachers' strike, with a clear and present danger or threat to the health, safety or welfare of the public.

I believe this concept originated from what the majority in *Root v. Northern Cambria School District,* 10 Pa. Commonwealth Ct. 174, 309 A. 2d 175 (1973), proclaimed as dictum in our case of *Armstrong School District v. Armstrong Education Association,* 5 Pa. Commonwealth Ct. 378, 291 A. 2d 120 (1972). In *Root,* we stated: "Citing dictum in our case of Armstrong School District v. Armstrong Education Association, 5 Pa. Commonwealth Ct. 378, 291 A. 2d 120 (1972), to the

effect that the danger that the district will lose state subsidy by the failure to teach 180 days, if clear and present, would be proper grounds for enjoining a strike, the plaintiff argues that equity should in this, and presumably in every case where it is still possible to provide 180 days, so order." 10 Pa. Commonwealth Ct. at 180, 390 A. 2d at 178.

Although the majority here expressly explains that more is required than the mere passing of time upon which to foundation the enjoining of a teachers' strike, nevertheless it is inescapable that a principal basis of the lower court's decision to enjoin in the present case was stated as follows: "When a strike lasts so long that the 180 days requirement cannot be met, there is a clear detriment to the public welfare and the teachers *must be enjoined* from continuing it. Armstrong Sch. Dist. v. Armstrong Ed. Assn., et al., 5 Commonwealth Ct. 378, 386 (1973); Bellefonte S. Bd. v. Bellefonte Ed. Ass'n., 9 Pa. Commonwealth Ct. 210, 215 (1973)." (Emphasis supplied.)

How unalterable is the 180-day instruction requirement? Section 1504(a), as amended, of the Public School Code of 1949, Act of March 10, 1949, P. L. 30, 24 P.S. §15-1504(a), provides in part as follows: "Upon request of a board of school directors for an exception to the aforesaid daily schedule [school shall open at nine ante-meridian and close at four post-meridian, with a noon intermission of one hour and fifteen-minute intermissions in the forenoon and afternoon], the Superintendent of Public Instruction may, when in his opinion a meritorious educational program warrants, approve a school week containing a minimum of twenty seven and one-half hours of instruction as the equivalent of five (5) school days, or a school year containing a minimum of nine hundred ninety hours of instruction as the equivalent of one hundred eighty (180) school days."

Here the record discloses undisputed testimony, not adhibited by the lower court, that, by adding one-half hour to each school day, the minimum number of days necessary to achieve 990 instructional hours is 165 days. If one hour were added to each school day, the 990 hours of instructional time would be achieved in 153 school days.

Granted, such reasonable lengthening of the school day may be inconvenient and unfair to the pupils and their families. However, as I noted in dissent in *Root v. Northern Cambria School District, supra,* the Legislature, not the courts, should alleviate and correct the inequities to pupils which result from the superimposing of the right of school teachers to strike on the specific and mandatory attendance requirements of the School Code.

The court below stated its other principal reason for granting injunctive relief in these words: *"It is enough* for the Chancellor *to find* from the evidence, as he does hereby, *that the strike has caused incalculable harm* to the students, the public at large and, indeed, to the teachers themselves." (Emphasis supplied.) I do not believe this is the test established by the statute or enunciated by us in *Armstrong School District v. Armstrong Education Association, supra.*

In *Armstrong* we stated:

"In order to deal with the problem of public employee labor relations, the Legislature in 1970 enacted Act No. 195. This Act explicitly recognized the right of public employees to organize and to bargain collectively, and it also established specific procedures for collective bargaining which were intended to lessen the possibility of the development of an impasse. The Act provided, however, that if all the procedures have been complied with, and yet an impasse has developed, the right of the employees to strike must be recognized. The public employer is then given the right to seek eq-

uitable relief, including injunctions, in the court of common pleas of the jurisdiction where the strike occurs. Section 1003 of Act No. 195 provides, however, that an injunction may not issue unless '. . . the court finds that the strike creates a clear and present danger or threat to the health, safety or welfare of the public.'

". . . [T]he determination of whether or not a strike presents a clear and present danger to the health, safety or welfare of the public must, therefore, require the court to find that the danger or threat is real or actual and that a strong likelihood exists that it will occur. Additionally, it seems to us that the 'danger' or 'threat' concerned must not be one which is normally incident to a strike by public employees. By enacting Act No. 195 which authorizes such strikes, the Legislature may be understood to have indicated its willingness to accept certain inconveniences, for such are inevitable, but it obviously intended to draw the line at those which pose a danger to the public health, safety or welfare.

. . . .

"The disruption of routine administrative procedures, the cancellation of extracurricular activities and sports and other such difficulties are most certainly inconvenient for the public, and especially for students and their parents. But these problems are inherent in the very nature of any strike by school teachers. If we were to say that such inconveniences, which necessarily accompany any strike by school teachers from its very inception, are proper grounds for enjoining such a strike, we would in fact be nullifying the right to strike granted to school teachers by the legislature in Act No. 195.

. . . .

". . . The fact that students and teachers might have to remain in school later in June than originally planned may be unfortunate, of course, but again it is

merely an inconvenience inherent in the right of school teachers to strike, a right now guaranteed them by the law." 5 Pa. Commonwealth Ct. at 382-86, 291 A. 2d at 123-25 (footnote omitted).

Lastly, the lower court concluded that "[s]chool subsidies will most probably be lost as a direct result of this situation." This conclusion was preceded by the observation, not accepted by this writer, that "[t]here is now no possibility of the District's fulfilling the mandate of the School Code that there shall be at least 180 days of school by June 30, 1974, the end of the fiscal year." We have indicated the alternative of lengthening the school day by a few minutes, and of course there was the unpleasant alternative of shortening or eliminating scheduled vacation periods and rescheduling some of the lost instructional days in June of 1974. In addition, there was testimony, apparently rejected by the lower court, that in fact the school district would be financially advantaged by fewer days of school with the resulting decrease in expenses and costs, even reflecting the loss of some subsidies.

Here the majority holds that the chancellor correctly determined "that the threatened loss of the subsidies would constitute a danger which required that the strike be enjoined." I cannot reach that conclusion by a reading of this record.

In conclusion, I would note that nothing written here is intended to be critical of the court below since its role is a most difficult one. The words of the applicable statute and the reported pronouncements of the appellate courts, on the one side, and the exigencies of the situation that confronts him, on the other side, make his moment of decision a most unenviable one. Being the parent of a child enrolled in a school district that as recently as September 1973 experienced the ordeal of a school strike, I am well cognizant of the many

community pressures,[1] added to the assertions of teacher and school board, that center on the chancellor.

My dissent here is based solely on my sincere belief that the chancellor, faced with legal uncertainty in this area, used the wrong legal test in reaching his decision to enjoin the teachers from continuing their legally authorized strike and that our affirmance will serve to further perplex other chancellors when they face similar lonely and demanding moments of decision.

In summary, I do not believe that, where a teachers' strike prevents a school district from having 180 days of instruction in a school year with a consequence of possible lost state subsidy, there is thereby a clear and present danger or threat to the health, safety or welfare of the public.[2] Nor does adding thereto the inherent inconveniences, disruptions, and problems caused students, their parents, and the public which inevitably flow from any strike by school teachers justify the enjoining of such a strike.

We rejected these criteria in *Armstrong School District v. Armstrong Education Association, supra,* on the reasoning that they would nullify the right to strike granted to school teachers by the Legislature. I would not retreat from that position on this record.

I hold to the view that the substantive evil, which is not the strike itself because legally permitted nor the natural disruptions flowing therefrom, must be extremely serious and the degree of imminent danger ex-

---

[1] Not the least of which is the burning question of whether the football games will be played as scheduled or forfeited as a result of the strike's continuing.

[2] If the contrary is true, then it follows that (1) any strike which infringes upon the 180-day requirement is infected with almost presumptive invalidity and (2) the school board is assured that its position in negotiations at the bargaining table, whether fair or unfair, will prevail if only it can hold out long enough to encroach on the 180-day requirement.

tremely high[3] before the courts can utilize the extraordinary remedy of injunctive relief to terminate a strike specifically authorized by statute.

Judge KRAMER joins in this dissent.

---

[3] Violence or threat of impending violence would be an example of the requisite danger or threat to health, safety or welfare of the public that would justify enjoining a teachers' strike.

---

DISSENTING OPINION BY JUDGE KRAMER:

I join in the dissent of my brother, Judge MENCER; but I feel constrained to add a few extra words of caution consistent with my prior concurring opinion in *Bellefonte Area School Board v. The Bellefonte Area Education Association,* 9 Pa. Commonwealth Ct. 210, 219, 304 A. 2d 922, 926 (1973).

As I view these disputes between school districts, teachers, labor unions and taxpayers, no one really represents the interests of the students, who are the beneficiaries or victims of the disputes. In addition to other rights they may have, students have a constitutional right to a thorough and efficient system of public education, as found in Article III, Section 14 of the Pennsylvania Constitution of 1968. Absent adequate safeguards (at the very least representation), I question the validity of statutory procedures which may detrimentally affect these guaranteed rights.