**Blackhawk School District v.
Pennsylvania State Education Association**

*Oran W. Panner,* for plaintiff.
*John R. DeAngelis,* for defendants.

KLEIN, *J.,* January 9, 1976—On January 2, 1976, plaintiff, Blackhawk School District (hereinafter "School District") filed a complaint in equity seeking injunctive relief against defendant, Blackhawk Education Association (hereinafter "BEA"), and its parent organization, defendant, Pennsylvania State Education Association (hereinafter "PSEA"). Also named as defendants were Keith D. Kohlhepp, President, and Carl R. Graham, Secretary-Treasurer, individually and as trustees ad litem for BEA, and Richard G. Temple, District Field Representative of PSEA. Said complaint was properly filed pursuant to section 1003 of the Public Employe Relations Act of July 23, 1970, P.L. 563 (No. 195), 43 P.S. §1101.1003. The prayer for relief requests a permanent restraining order enjoining an on-going teachers' strike which commenced December 8, 1975, and further equitable relief incident thereto.

Pursuant to duty imposed upon the court to hold a hearing upon such a complaint forthwith, the court scheduled the hearing to commence January 7, 1976. At the time set for hearing, defendants presented to the court an answer to the complaint con-

taining new matter and a counterclaim. Plaintiffs subsequently filed a reply to new matter and answer to counterclaim.

A hearing was held commencing at 9:30 a.m., January 7, 1976, and was concluded January 8, 1976, at 1:30 p.m. Testimony was offered by both sides. Summations addressed to the chancellor as fact finder commenced at 9:15 a.m., January 9, 1976, and were concluded at 10 a.m.

## STATEMENT OF ISSUES

There being no evidence suggesting an adverse impact upon the health and safety of the public resulting from the teachers' strike, the sole issue before the court is, whether the strike, now in progress for the thirty-third calendar day, including 16 pupil instruction days, has created a clear and present danger or threat to the welfare of the public.

## FINDINGS OF FACT

1. There are 4,380 students in the school district, including 44 special education students, and the physical arrangement comprises nine school buildings, including one senior high school.

2. The district encompasses eight municipalities: Chippewa Township, Darlington Borough, Darlington Township, Patterson Heights Borough, Patterson Township, South Beaver Township and West Mayfield Borough in Beaver County, and the "Enon Valley" section of Butler County, with a total population currently estimated at approximately 18,500 (two percent increase since 1970 census). Consequently, the public school students represent 23.7 percent of the population.

3. The school district employs 206 professional

employes as teachers, guidance counselors, librarians and nurses who comprise the bargaining unit for whom defendant BEA, a certified employe organization, is the duly authorized exclusive bargaining representative. Defendant PSEA is the parent affiliate of the BEA and defendant, Richard Temple, is the district representative of PSEA, servicing BEA.

4. In addition to said professional employes, the school district employs necessary administrators, teacher aides and noninstructional personnel, including clerical, custodial and cafeteria workers. The nonprofessional employes laid off due to the strike will suffer no long term loss of income if the school district is able to provide 180 days of pupil instruction by June 30, 1976. And, in the event that is not possible, any loss will be virtually nil in net take-home pay due to eligibility for unemployment compensation benefits. (This court fully intends to invoke its injunctive powers completely when we conclude, following necessary due process procedures, that the incidental inconveniences and incidental harm occasioned by the lawful strike accumulate to such an extent, be continued so long or be aggravated by some unexpected development, as inevitably one or another of such factors will occur.)

5. The bus drivers, employed by a private contractor, will lose money in the long run only if the 180 days are not attained.

6. All processes of negotiation, mediation and fact-finding required by law were completed prior to December 8, 1975, the date the strike commenced, thus making the strike legal under the Public Employe Relations Act. Negotiations between the parties are continuing, as is the strike.

7. There is a duly approved school calendar for the year 1975-76 providing for pupil instruction to commence September 2, 1975, and to terminate on June 4, 1976. This calendar allows for 180 days of pupil instruction and, in addition, various vacation periods, holiday recesses, teacher in-service days and "snow" days.

8. As of the date of this hearing, January 7, 15 school days have been lost because of the strike; if school would resume Monday, January 12, 1976, 184 days of instruction could be completed by June 30, 1976, provided that only Good Friday and Memorial Day were not school days (between Monday and Friday, inclusive, each week):

As of January  7 — 187 days
As of January  8 — 186 days
As of January  9 — 185 days
As of January 13 — 183 days
As of January 14 — 182 days
As of January 15 — 181 days
As of January 16 — 180 days

9. Should school remain in session beyond June 11, 1976, Blackhawk students (usually about 40) will not be able to attend the summer session for remedial or enrichment purposes at neighboring Big Beaver Falls Area School District. (Plaintiff offers no such program of its own.)

10. Since the work stoppage commenced, all extra-curricular, and co-curricular, activities have ceased except for varsity athletic programs.

11. There are 335 seniors, approximately 35 percent of whom go on to college and 15 percent of whom attend some other type of post-high school educational, vocational or technical program.

12. Many senior students not going on to post-

high school programs seek permanent job opportunities and a late-entry into the job market will undoubtedly be a handicap both as to obtaining any job and certainly as to obtaining the most desired employment. Many seniors who plan to further their education or otherwise acquire job skills and many underclassmen, particularly aged 14 and up, will seek summer or part-time employment and will be similarly handicapped by late entry into the job market.

13. The school district employs a counseling staff (all on strike) which aids the students with regard to taking college board exams, college admission applications, financial aid applications, in work-study programs and job placement.

14. The students in work-study programs continue to work; most job-placement occurs during the spring months and has not yet been affected; college board exam-taking has been adversely affected as to the December and January exams, but the November test was not affected and the April and June 1976 exams have not yet been affected. Most college-bound seniors take the college boards during their junior year and again during their senior year. Experience shows that most students achieve approximately the same score in both years; a few do significantly better the second time and a few do significantly poorer.

15. Some senior students will be deprived of a desired college admission because they will be unable to matriculate the second week of June if the strike is not halted shortly. (Indiana U. of Pa. and Edinboro, two of the most popular schools for Beaver County residents require June matriculation for marginal students.)

16. There are 10 to 15 special education students

in the high school program, including seniors. A continuation of the strike will adversely affect the job opportunities of such senior students because of its effect on their abilities, coupled with late entry into the job market.

17. There are, at least, a few working mothers in the Blackhawk School District and school officials have received some complaints concerning their problems resulting from the strike—the need and cost of baby sitters, and concern over their children's well being while they are at work.

18. The permanent loss of school days would not cause a financial loss to the school district, although it would cause a reduction of revenue in the 1976-77 school year. Indeed, there will be a net increase in available revenues over the long run. The loss, sad to state, will be purely a loss of education to children, incalculable in dollars. Some expenses continue whether school is in session, just as during vacation periods.

19. The strike now creates a clear and present danger or threat to the welfare of the public only to the extent of the interruptions in the educational program for seniors and high school special education students. The harm which necessarily flows from such an interruption so far as the underclass students are concerned has not yet created a clear and present danger or threat to the health, safety or welfare of the public, because ample time and opportunity to substantially make up the work will be available to such students prior to completion of their public school education, coupled with natural enthusiasm and resiliency of youth.

20. The disruption of routine procedures, the harassment of school directors, and the divisions created in the community are clear and present but

they do not yet constitute a "danger" or "threat" as envisaged by Act No. 195; and, the potential loss of subsidies may be a "danger" but it is not yet "clear and present."

21. Although prospects for an early settlement appear uncertain, the entire history of labor-management negotiations, both in the public and private sectors, makes it clear that a single, significant concession offered by one side or the other may precipitate a final agreement within the day.

22. The loss of earned income to municipalities and the school districts of employes' domiciles (mainly Blackhawk and its eight participant municipalities) will be minimal unless nowhere near 180 days are provided. However, the strike has and will cause a shift of the receipts from one fiscal year to the next.

23. The period from January to March or April (when spring fever sets in) is the most productive learning period in a September-June academic year.

24. Some seniors will lose opportunities for financial aid from Federal, State or college sources by reason of late application, late filing, and late acceptance or matriculation.

25. The parents of students and other citizens of the school district are deeply concerned about the crisis and its likely future deterioration of community morale and spirit, the possible adverse effects upon future relationships between student-teacher, parent-teacher, teacher-board, board-community and neighbor-to-neighbor relationships, as some citizens side with the teachers' demands and others support the district's "holding fast." A blanket of despair, helplessness and

hopelessness is enveloping the community spirit in an ever-increasing spiral with every passing day.

26. Some students are developing bad habits of watching too much TV, retiring late and arising late; loafing in gangs which inevitably leads to fracases if long practiced. Happily, no such community problem has yet occurred.

27. The clear and present danger or threat to the public welfare occasioned by the strike as to the seniors affects the public permanently. Such students, because of the interruption, will be diverted into paths of life which they would not otherwise plan or contemplate. Some will unexpectedly marry early and the responsibility may cause them to abandon plans for further education, thereby adversely affecting their families, present and future. Others may get stuck in the rut of a job with limited potential; others will be developing bad habits of work or study which will not easily be altered and with no opportunity to get back on the track as the underclassmen will have in the next school year.

28. Effective January 5, 1976, the school district commenced an alternative program for seniors, providing instruction in English, social sciences and physical education. It has not yet been determined by the Department of Education whether "credit" will be approved for said program. The program, even if accredited, falls far short of the constitutionally mandated thorough and efficient system of public education and is unacceptable in fact.

29. The subsidy loss, should it occur, in 1976-77, will be irretrievable. Although it presents no financial loss to the school district, it necessarily deprives the citizens of the Blackhawk School District

of their full share of Commonwealth funds for purposes of education and will, indeed, represent a clear and present danger to the welfare of the public at some point in the future—should the strike continue much longer.

## CONSTITUTION

"The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth.": art. III B, sec. 14.

## I. DECLARATION OF PUBLIC POLICY

Public Employe Relations Act:

"The General Assembly of the Commonwealth of Pennsylvania declares that it is the public policy of this Commonwealth and the purpose of this act to promote orderly and constructive relationships between all public employers and their employes subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare. Unresolved disputes between the public employer and its employes are injurious to the public and the General Assembly is therefore aware that adequate means must be established for minimizing them and providing for their resolution. Within the limitations imposed upon the governmental processes by these rights of the public at large and recognizing that harmonious relationships are required between the public employer and its employes, the General Assembly has determined that the overall policy may best be accomplished by (1) granting to public employes the right to organize and choose freely their representatives; (2) requiring public

employers to negotiate and bargain with employe organizations representing public employes and to enter into written agreements evidencing the result of such bargaining; and (3) establishing procedures to provide for the protection of the rights of the public employe, the public employer and the public at large.": 43 P.S. §1101.101.

## II.   PERTINENT STATUTORY PROVISIONS

A. Public Employe Relations Act, 43 P.S. §§1101.101, et seq.:

Section 1003:

"If a strike by public employes occurs after the collective bargaining processes set forth in sections 801 and 802 of Article VIII of this act have been completely utilized and exhausted, it shall not be prohibited unless or until such a strike creates a clear and present danger or threat to the health, safety or welfare of the public . . .": 43 P.S. §1101.1003.

B. Public School Code of 1949, Act of March 10, 1949, P.L. 30, 24 P.S. §§1-101, et seq.:

Section 1501:

"All public kindergartens, elementary and secondary schools shall be kept open each school year for at least one hundred eighty (180) days of instruction for pupils. No days on which the schools are closed shall be counted as days taught . . .": 24 P.S. §15-1501.

Section 1502:

"No school shall be kept open on any Saturday for the purpose of ordinary instruction, except when Monday is fixed by the board of school directors as the weekly holiday, or on Sunday, Memorial Day,

Fourth of July, or Christmas nor shall any school be kept open in any district during the time of holding the teachers' institute for such district . . .": Act of January 24, 1966, P.L. (1965) 1508 (No. 529), 24 P.S. §15-1502.

Section 1504:

"(a) The board of school directors of each school district shall fix the date of the beginning of the school term. Unless otherwise determined by the board, the daily session of school shall open at nine ante-meridian and close at four post-meridian, with an intermission of one hour at noon, and an intermission of fifteen minutes in the forenoon and in the afternoon. Upon request of a board of school directors for an exception to the aforesaid daily schedule, the Superintendent of Public Instruction may, when in his opinion a meritorious educational program warrants, approve a school week containing a minimum of twenty seven and one-half hours of instruction as the equivalent of five (5) school days, or a school year containing a minimum of nine hundred ninety hours of instruction as the equivalent of one hundred eighty (180) school days . . .": 24 P.S. §15-1504.

### III.   PERTINENT CASE LAW

Armstrong School District v. Armstrong Education Association, 5 Pa. Commonwealth Ct. 378, 291 A. 2d 120 (1972).

". . . Additionally, it seems to us that the 'danger' or 'threat' concerned must not be one which is normally incident to a strike by public employees. By enacting Act No. 195 which authorizes such strikes, the Legislature may be understood to have indicated its willingness to accept certain incon-

veniences, for such are inevitable, but it obviously intended to draw the line at those which pose a danger to the public health, safety or welfare.

"The reasons indicated by the court for granting the injunction here fall generally into three categories: (a) the disruption of routine procedures; (b) the harassment of School Board Directors; and (c) the danger of losing state subsidies because of the inability of the District to provide the full schedule of 180 instructional days.

"The disruption and the harassment were certainly 'clear and present' but they did not constitute a 'danger' or 'threat' as envisaged by Act No. 195. On the other hand, the loss of school subsidies was a 'danger,' but it was not, at least not yet, 'clear and present.'

"The disruption of routine administrative procedures, the cancellation of extracurricular activities and sports and other such difficulties are most certainly inconvenient for the public, and especially for students and their parents. But these problems are inherent in the very nature of any strike by school teachers. If we were to say that such inconveniences, which necessarily accompany any strike by school teachers from its very inception, are proper grounds for enjoining such a strike, we would in fact be nullifying the right to strike granted to school teachers by the legislature in Act No. 195.

"A more serious problem is raised by the community unrest and the harassment of public officials which have apparently occurred in reaction to the strike. The testimony gives no indication as to who has been involved in these incidents, although it was made clear as to some situations that the Association's members were not so involved. We

deplore such activities and sympathize with the lower court's wish to bring them to an end. Enjoining the strike, however, was not a proper method of accomplishing this purpose. In this situation it does not seem to be the strike which was the 'danger' to the public, but the reaction to it by persons unknown. We cannot find that Section 1003 of Act No. 195 was intended to permit striking employees to be penalized by having their strike enjoined because a number of citizens oppose their stand and choose to show this by disrupting the community. There are other laws available to deal with such disorders.

"The danger that the District will lose state subsidies because of a strike would be proper grounds for enjoining the strike if such danger were 'clear and present.' And, although it is not certain that subsidies will in fact have to be withheld because of the strike, it is a possibility which cannot be ignored. If the strike lasted so long, therefore, that any continuation would make it unlikely that enough days would be available to make up the 180 required, the teachers could be properly enjoined from continuing it. At the time of the last hearing, however, the strike had lasted only 12 days, and the District had 20 days available in June plus 19 holiday dates which could be used to make up time lost. The possibility that the strike would extend longer than the make-up time available did not yet exist. If a strike is to be enjoined on the basis that insufficient make-up time actually will exist, the strike must at the very least have reached the point where its continuation would make it either clearly impossible or extremely difficult for the District to make up enough instructional days to meet the subsidy requirement within the time available. This strike was far from that point when the Court

below enjoined it. The fact that students and teachers might have to remain in school later in June than originally planned may be unfortunate, of course, but again it is merely an inconvenience inherent in the right of school teachers to strike, a right now guaranteed them by the law.

"We must hold that at the time this injunction was issued, there were no reasonable grounds on which the lower court could find that the strike by the Association was a 'clear and present danger or threat to the health, safety or welfare of the public.' This is not to say, of course, that public employees may strike with impunity and ignore the public interest, nor that such inconveniences as those noted herein as incidental to a strike might not conceivably accumulate to such an extent, be continued so long or be aggravated by some unexpected development, so that the public health, safety and welfare would in fact then be endangered. We must hold, however, that the proper purpose of an injunction under Act No. 195 is to avert present danger; not to prevent danger which may never occur at all or which can only occur, if it does occur, at some future time before which the grievances concerned can reasonably be expected to be settled."

Injunction dissolved.

Bellefonte Area School Board v. Bellefonte Area Education Asso., 9 Pa. Commonwealth Ct. 210, 304 A. 2d 922 (1973).

Injunction order reversed.

In Bellefonte: "The strike was attended with no violence or, indeed, with anything which could be characterized as unpleasantness, except as the clash of wills and opinions evidenced in the testimony must have been disturbing to persons on

both sides." Instantly, when the school district commenced an alternative program for seniors on January 5th, members of BEA mass picketed, delaying three buses' arrival at the high school for ten or 15 minutes; on another occasion, a number of pickets sat in the roadway prohibiting the buses from entering the school property, requiring the students to disembark on the roadway and they walked into the school building without incident; two bus tires were damaged by nails and a sideview mirror was broken; the teachers slapped the exteriors of the buses and a few epithets were shouted. No person was injured; the illegal activities were enjoined by this court within 29 hours of the first incident and there has been no recurrence and none is anticipated. The unpleasantness mentioned is hardly sufficient to pose a clear and present danger to the health, safety or welfare of the public.

Such illegal behavior by the teachers, we have no doubt, was motivated by a desire to discourage attendance and cause the program to fail. Only six of approximately 300 students returned home.

Bristol Township Education Association v. School District, 14 Pa. Commonwealth Ct. 463, 322 A. 2d 767 (1974).

Injunction sustained.

Distinguishing facts making case inapposite:

1. 26 student days lost, with only 23 possible make-up days.

2. partial loss of state reimbursement—a substantial sum.

3. county services not available for students with hearing, vision or speech disabilities.

4. community programs inoperative because of strike.

(a) driver education.

(b) swim program with life-saving practices and rescue squad practice.

(c) adult education.

(d) the only driver improvement program in lower Bucks County.

(e) Federally funded "itinerant teachers."

(f) social worker.

(g) free lunch.

". . . This does not mean, of course, that the Legislature intended to put a limit on the number of days that a strike might last. Nor does it mean that the mere loss or threatened loss of subsidies is alone sufficient to warrant the enjoining of the strike. It is also necessary to establish that the loss of such subsidies would present a danger or threat to the health, safety or welfare of the public. Here the Chancellor specifically found, on the basis of sufficient evidence, that the appellee would be unable to make up all the days lost by the strike and that a continuation of the strike would further aggravate the situation. The subsidy could be lost for the days not made up and there was evidence offered as to the effect of such a possibility. The Chancellor weighed this evidence, as was his responsibility, and determined that the threatened loss of the subsidies would constitute a danger which required that the strike be enjoined. We cannot hold that he erred in so finding.

"As to the other findings made by the Chancellor, we cannot hold that any of them taken alone or considered together would necessarily constitute a basis for the injunction issued herein. All are inconveniences which the legislature could reasonably have expected would ordinarily occur as the result of a strike by school teachers. This is not to

say, however, as we noted in Armstrong I, 'that such inconveniences . . . incidental to a strike might not conceivably accumulate to such an extent, be continued so long or be aggravated by some unexpected development so that the public health, safety and welfare would in fact then be endangered.' 5 Pa. Commonwealth Ct. at 386-387, 291 A. 2d at 125. Here the strike has lasted for 26 days and it would not necessarily have been unreasonable for the Chancellor to find that some of the above noted inconveniences had accumulated or been aggravated to such an extent as to warrant the issuance of an injunction. Even as to the community-wide programs, those not involved only with the schools or the educational process, the cumulative and extended loss of such programs (i.e., programs for social workers and 'Itinerant teachers,' the work experience program, the driver improvement program, etc.) could have a detrimental effect on the welfare of the community as a whole. See Ross, supra . . .''

Ross v. Philadelphia Federation of Teachers, 8 Pa. Commonwealth Ct. 204, 301 A. 2d 405 (1973).

Injunction sustained. VASTLY inapposite on the facts.

Root v. Northern Cambria School District, 10 Pa. Commonwealth Ct. 174, 309 A. 2d 175 (1973).

"The Legislature's direction that schools shall be kept open 180 days of course means that school boards shall schedule and attempt to provide for school sessions of this duration. Boards are not, however, thereby required to do either the impossible or the impractical in circumstances not within their control. There are many reasons why, having scheduled the required number of instructional

days, the board may be unable to provide them, one of the most obvious of which is strike action by its employes sanctioned by the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, 43 P.S. §1101.101 et seq. . . . The decisions of school boards must be based solely on consideration for the people's interest in a thorough and efficient system of education. . . . Article III, Section 14, of the Pennsylvania Constitution . . . Boards must schedule 180 days and provide this number or, if unavoidable cause prevents, amend the schedule so as to provide as many days as sound educational practice would indicate. In this determination, its professional administrators' opinions should have the greatest weight.": 24 P.S. §§5-508, 15-501, 15-503, 15-504.

## DISCUSSION

### I.

This court is confronted with the perplexing problem of whether to enjoin the teachers' strike which has interrupted the educational program for 4,380 students of the Blackhawk School District. Other Pennsylvania courts have faced similar problems with varying results since enactment of the Public Employe Relations Act of July 23, 1970, P.L. 563, 43 P.S. §§1101.101, et seq., in 1970.

### II.

The legislature, acting within its constitutionally mandated power to legislate, has authorized strikes by public employes to occur and continue unless and until the strike creates a clear and present danger or threat to the health, safety or welfare of the public. That said latter provision would create a clear and present danger of complicated, forthwith

adjudication by the front-line cadre of the judicial branch of government has come as no surprise to the Legislature who enacted—in the words of Judge Rogers (Bellefonte)—:"When Legislatures finally determine to adopt a wholly new concept of public management, they usually do so in terms more expressive of their fear of the unforseeable harm which may result from the new policy than of their confidence in the good it will accomplish. Hence, such legislation is often tentative, imprecise, elliptical and incomplete, leaving the hard choices either to the improbable chance that they 'may not come up,' or to the courts. The Public Employe Relations Act, Act of July 23, 1970, P.L. 563, 43 P.S. §§1101.101, et seq., is an example of such legislation. It reverses the immemorial policy of state government to prohibit public employes from striking. It countenances strikes by public employes, but only upon the condition that certain ill-defined procedures have first been accomplished; and it empowers the courts to enjoin perfectly legal strikes if the courts find that they create 'a clear and present danger or threat to the health, safety or welfare of the public.'"—after years of commission studies, public hearings, seminars, legislative committee meetings and debate in both houses of the Legislature.

However, in fairness to the legislature, we must candidly state that we have seen no perfect legislation since biblical revelation nor do we ever expect to see any so long as it is fashioned by human beings.

Simple honesty also requires us to call to every citizen's mind that the legislature, in Act No. 195, sought to remedy a situation which was rapidly

developing a clear and present danger and threat to the public in the areas of police and fire protection, sanitation, transportation, health, education and welfare, health and safety generally. The act, imperfect though it is, has had remarkable success.

The greatest area of failure, though small in relation to the potential, has occurred as a result of teacher strikes. Undoubtedly, this results from the fact that virtually every affirmative strike vote cast by a teacher was made with the full expectation (subsequently realized except in a few cases and there rather insignificant amounts) that not one penny of income would be lost in the long run because of making up days lost. The legislature, however, and not the courts have the duty to deal with that problem. How to resolve it without injury to school children won't be easy.

On point—the Hon. K. Leroy Irvis, a distinguished Representative in the General Assembly and an able lawyer of considerable experience, said on final passage in the House on July 20, 1970:

"For instance, there is the fact that strikes that adversely affect 'health, safety and welfare' are banned. I am in favor of prohibiting strikes in the first two instances, but oppose the inclusion of the third criterium. I believe that the word 'welfare' can be interpreted so broadly that it might prohibit all strikes."

Webster defines welfare as "the state of doing well, especially in respect to good fortune, happiness, well-being, or prosperity." That involves everything, of course, including a free-flowing drain in the proverbial kitchen sink. Obviously then, the legislature contemplated a significant clear and present danger or threat to the well-being

and happiness of the public. Such was not established in this case except to a very limited sphere of the educational program of the school district.

And as the nationally-renowned labor arbiter, Theodore W. Kheel said:

"Nobody wins a strike against schoolchildren, or against the sick, or against bus or subway riders. We can avoid such strikes. The challenge is to improve collective bargaining — not to replace it."

In a free society, compulsory arbitration simply is not the answer, save only in protection of the public health and safety and the judicial process for the resolution of disputes and protection of society from the criminal element.

And, Arthur H. Reede, of St. Francis College, during a symposium on Act No. 195 on October 9, 1970, said:

". . . At some point, a strike by garbage workers is likely to be held to endanger public health, as would also a strike by nurses. The threat to public safety is undoubtedly the explanation of the ban on strikes by policemen and firemen.

"Strikes by teachers are unlikely to be limited on this ground but, if long protracted, rather on the ground that they endanger the public welfare. In a prolonged test of strength, adamant teachers and school board members would be relying less on the pressure they exert on one another, than on the pressure they exert on children and their parents. But only time will tell on what basis the courts will decide at what point a strike by any group of public employees becomes a threat to public safety, health or welfare."

III.

See also, the compelling logic of the concurring opinion by Judge Kramer in Bellefonte, also — where he said:

"Throughout this entire record, including the briefs of counsel, and argument before this Court, counsel for the parties have vigorously presented only two sides in this controversy, i.e., the teachers and the school district.

"From my point of view, there is a third indispensable side to this case, which has been ignored. That is the side of the school children. In this Commonwealth, they have a constitutional right, as expressed in our Pennsylvania Constitution of 1968 at article III, section 14, to have a 'thorough and efficient public education' provided for them.

"All of the parties to this case and the majority opinion blithely speak of using 'summer vacations' or holidays as a means of making up teachers' strike days to preserve state education subsidy funds. Not one word of concern is expressed for those school students who work on holidays and vacation days to stay in school. Not one word is utilized to protect high school seniors who must attend college summer school to gain admittance to college in the fall. Not one word is devoted to what happens if a high school senior's grades are not ready for timely submission to college for the fall admission. Not one word is said because the school children are not represented. They are the pawns in an adult game of economics. If the teachers and the school district agree to use all legal holidays, all weekends and all vacation time to make up for the lost days of a strike, does that mean the students will have no rest? Do they have any rights?

"I believe the time has come to recognize their problems and rights. The students should be, in reality, the third party beneficiaries of all such negotiations and contracts. In view of the fact that almost all of the students involved in this case are under age of 18, and not represented by counsel,

someone should look out for their rights. If the Attorney General, The Secretary of Education, and the Legislature do not provide for protection of those rights, then the courts should provide that protection."

We concur and for that reason, and for all of the other reasons above enumerated, we enter the following order, mindful that we are not Solomon and, as in child custody cases, one side or the other is bound to feel aggrieved. The result is not of our making. We are duty-bound to follow the guidelines established for us by our appellate courts. And, perhaps we have exceeded the normal of the habeas corpus judge by, we perceive, causing all parties to grieve to some extent: school district, school directors, taxpayers, teachers, other employes, students and parents. However, true to our oath of fidelity, we have applied the law as we understand it to the facts as we find them.

## IV.

Lastly, lawyers reading this opinion will question whether the court has the power to issue a special, limited injunction under the act in re a strike by public employes. We conclude that the broad power of issuing total injunctive relief halting a strike carries with it implicitly the power to issue a limited and partial injunction.

## V.

Defendants filed a counterclaim, claiming damages for (1) differential in pay due teachers for four days work in December, and (2) BEA dues withheld by school district and not remitted to BEA.

Pa.R.C.P. 1510 provides:

"(a) A defendant may plead as a counterclaim only a cause of action, whether equitable or legal,

which arises from the same transaction or occurrence or series of transactions or occurrences from which the plaintiff's cause of action arose. A counterclaim shall not be subject to the objection provided in Rule 1509(c).

"(b) A counterclaim shall be pleaded and tried as an action in equity."

We sustained plaintiff's objection to testimony about the salary due dispute because it did not arise "from the same transaction." At the same time, we ruled that the claim for dues would be tried but defendants offered no testimony concerning that matter. A judgment in favor of plaintiff against defendants re defendants' counterclaim must be entered.

## VI.

We also precluded defendants from presenting evidence concerning the school district's "unclean hands," etc. Such equitable defenses are not available in these proceedings. The action concerns the effect on the public, not the school district. The sole defense available is that there is no clear and present danger, etc.

## FACTUAL CONCLUSION

Senior students will likely be less productive citizens if the strike is not halted as to them. The public, wherever they may settle in their adult lives, will be the worse for it, as well as the seniors themselves. Indeed, it represents a threat to the welfare of the public, mainly the local community, but also the Commonwealth and the Nation.

## CONCLUSIONS OF LAW

1. The teachers' strike affecting the Blackhawk

School District has created a clear and present danger or threat to the welfare of the public to the extent of the interruption of the educational program for seniors and high school special education programs.

2. Said teachers' strike has not yet created a clear and present danger or threat to the health, safety or welfare of the public in any other respect.

3. A special, limited injunction should issue; a total and complete injunction terminating the strike should not issue.

4. Plaintiff is entitled to a judgment in its favor as to defendants' counterclaim.

## ORDER

And now, January 9, 1976, after hearing, under and pursuant to the Act of July 23, 1970, P.L. 563 (No. 195), art. X, sec. 1003, 43 P.S. §1101.1003, it is ordered and decreed that a special, limited injunction is issued against those members of the bargaining unit represented by defendant, Blackhawk Education Association who are teachers, guidance counselor(s), librarian(s), and school nurse(s) who have been engaged since September 1, 1975, as teachers, counselor(s), librarian(s), or nurse(s) in connection with the educational program for senior year students, including those seniors who may be enrolled in a special education program, limited to major subjects only.

It is further ordered and decreed that said persons discontinue withholding of their services to plaintiff, Blackhawk School District, to the extent of said plaintiff's educational program for seniors.

Still further, it is ordered and decreed as follows:

1. That an injunction is issued against defendants, Blackhawk Education Association, Pennsyl-

vania State Education Association, Keith D. Kohlhepp, President and Carl R. Graham, Secretary-Treasurer, individually and as trustees ad litem for Blackhawk Education Association and Richard G. Temple, District Field Representative of PSEA, enjoining and restraining them from all picketing and all other conduct which in any way will interfere with the senior educational program as above set forth, namely at the site of the high school; all other picketing and strike conduct may continue as heretofore.

2. That all defendants are enjoined from advising or causing or attempting to advise or cause any person against whom this injunction is issued to violate any term or condition thereof.

3. That this court retains jurisdiction of this matter to (1) insure compliance by the parties with the terms herein contained, and (2) to convene a further hearing in the matter upon petition of either party alleging a change in facts and circumstances and seeking any modification of the within order and decree, and reserving unto this court to, sua sponte, schedule such an additional hearing, recognizing as we do that the expected results of a teachers' strike which to date have not established a clear and present danger to the public with respect to the balance of the educational program of plaintiff school district, may, when such effects are accumulated over a more extended period of time have such a detrimental effect on the community as to warrant the issuance of a general injunction against the continuation of the strike.

This decree is entered under and pursuant to the Public Employe Relations Act, 43 P.S. §1101.1003, wherein is provided, inter alia:

"In such cases the public employer shall initiate,

in the court of common pleas of the jurisdiction where such strike occurs, an action for equitable relief including but not limited to appropriate injunctions and shall be entitled to such relief if the court finds that the strike creates a clear and present danger or threat to the health, safety or welfare of the public."

It is further ordered and directed that the school district forthwith notify all affected professional employes to report for work on Monday, January 12, 1976; and still further, the school district shall, by affidavit, certify the list of such employes, giving their names and addresses, and file same in these proceedings.

This order is not intended to preclude the school district from providing seniors with appropriate instruction in the "minor" subjects, such as health and physical education.

And, we find in favor of plaintiff as to defendants' counterclaim.