Benjamin H. Root, Appellant, *v.* Northern Cambria School District, a Quasi-Municipal Corporation, Appellee.

Argued June 4, 1973, before President Judge Bow-
man and Judges Crumlish, Jr., Kramer, Wilkinson,
Jr., Mencer, Rogers and Blatt.

Randall C. Rodkey, with him Green, Abood, Rodkey & Eckel, for appellant.

Vasil Fisanick, for appellee.

William Fearen, with him Cleckner and Fearen, for amicus curiae, Pennsylvania School Boards Association.

OPINION BY JUDGE ROGERS, August 28, 1973:

Benjamin Root, who describes himself as a resident, property owner and taxpayer of the Northern Cambria School District, appeals from orders of the Court of Common Pleas of Cambria County dismissing, after trial, two complaints in equity by which he sought decrees which would require the Northern Cambria School Board to keep its several schools open for instruction commencing on December 22, 1972 and on each and every weekday thereafter until June 30, 1973, except Thanksgiving Day, Christmas Day, New Year's Day, Good Friday and Memorial Day. It is not entirely clear whether the court dismissed the complaints because it thought equity was without jurisdiction be-

cause mandamus was available as a remedy, or because it believed the record did not support its interference with the school board's actions in the premises. Two extensive trials were held and the proceedings, including the court's opinions, demonstrate a patient consideration of the issues. Therefore, although our review might confine itself to jurisdictional and other procedural and technical problems in the litigation, past and present,[1] we will consider the matter on the merits because the issues are of public importance and the problems are "capable of repetition, yet evading review."[2]

The litigation is the result of a lawful strike by the teachers' union of the school district which closed the schools from August 29, 1972 until October 12, 1972. The teachers went back to work on the latter date in compliance with an order of the Cambria County Common Pleas Court. Thirty instruction days were thus lost. When the instant suits were brought, the first in November and the second in December, it was, as plaintiff requested, necessary that school be conducted every weekday through the end of June in order that there be provided 180 days of instruction during the school year 1972-1973. The school board's calendar adopted before the strike provided for a number of days off for holidays and snow emergencies and for the end of instruction on June 1, 1973. The board refused to amend

---

[1] Among which are: (a) That the court below entertained the matter a second time on a new complaint (because an appeal of the first suit would have been time consuming) although the defense of res adjudicata was raised; (b) that, as the defendant contends, the issue is moot; (c) that plaintiff is without standing, having failed to allege any special interest and having claimed to be representing no class of persons especially interested.

[2] *Moore v. Ogilvie*, 394 U.S. 814, 89 S. Ct. 1493, 23 L. Ed. 2d 1 (1969) ; but compare *Boone et al. v. Tate*, 4 Pa. Commonwealth Ct. 101, 286 A. 2d 26 (1972).

its calendar after the strike and only 150 days of instruction during the 1972-1973 school year were provided for.

Unfortunately, there is more than a suggestion in the record that Mr. Root is really representing the teachers' interest in making up the lost instruction days in order to avoid a loss of salary. Equally unhappily, it appears that the school board refused to amend its calendar because it wanted the teachers to lose salary because of the strike. The histories in the brief and statements of counsel so indicate; more tellingly, however, in fact all items of dispute between the board and the teachers were settled when only seven days of instruction had been lost. The teachers then additionally insisted that the board make up the lost days; the board took the position that this issue was one of inherent managerial policy on which it was not required to bargain but on which it would "meet and discuss" after the teachers went back. Counsel for the board quite frankly stated at argument that the board expected the teachers to reply with the suggestion that three or four of the days might be supplied. The result of this "negotiation" was that the children lost an additional 23 days of instruction. We have, therefore, another case of the type against which Judge KRAMER so vigorously inveighed in his concurring opinion in *The Bellefonte Area Education Association v. The Board of Education of the Bellefonte Area School Board,* 9 Pa. Commonwealth Ct. 210, 304 A. 2d 922 (1973), in which the children are aptly described as ". . . pawns in an adult game of economics."

The plaintiff argues that the court below should have ordered the board to keep school every weekday until the end of June because Section 1501 of the Public School Code of 1949, Act of March 10, 1949, P. L. 30, 24 P.S. §15-1501, provides: "All public . . . schools

shall be kept open each school year for at least one hundred eighty (180) days of instruction for pupils." The board counters by reference to a number of provisions of the Public School Code giving it broad power to establish the school calendar, to schedule school days and to fix the length of the school year. Sections 508, 1503, 1504 of the Act of March 10, 1949, 24 P.S. §§5-508, 15-1503, 15-1504. None of the statutes cited by either side has quite the force ascribed to them by their proponents. The Legislature's direction that schools shall be kept open 180 days of course means that school boards shall schedule and attempt to provide for school sessions of this duration. Boards are not, however, thereby required to do either the impossible or the impractical in circumstances not within their control. There are many reasons why, having scheduled the required number of instructional days, the board may be unable to provide them, one of the most obvious of which is strike action by its employes sanctioned by the Public Employe Relations Act, Act of July 23, 1970, P. L. 563, 43 P.S. §1101.101 et seq. Similarly, the control of school schedules given boards by the Legislature is not without limitations. School districts were created to perform a function of government ordered by the people, not one merely authorized by the Legislature. Article 3, Section 14 of the Pennsylvania Constitution. The decisions of school boards must be based solely on consideration for the people's interest in a thorough and efficient system of education; and courts of equity have the power and duty to require that board action conform to the public interest. *Hibbs v. Arensberg,* 276 Pa. 24, 119 A. 727 (1923). The public interest is that of conducting a good school system; not that of achieving greater participation of teachers' organizations in school policy, or that of maintaining unfettered control of school affairs by lo-

cal boards of education, or that of establishing the highest or lowest possible salary schedules, or that of exempting from or imposing upon professional employes noninstructional duties, or, finally, that of nourishing or weakening employe associations. Boards must schedule 180 days and provide this number or, if unavoidable cause prevents, amend the schedule so as to provide as many days as sound educational practice would indicate. In this determination, its professional administrators' opinions should have the greatest weight.

Another contention of the plaintiff deserves mention. Citing dictum in our case of *Armstrong School District v. Armstrong Education Association*, 5 Pa. Commonwealth Ct. 378, 291 A. 2d 120 (1972), to the effect that the danger that the district will lose state subsidy by the failure to teach 180 days, if clear and present, would be proper grounds for enjoining a strike, the plaintiff argues that equity should in this, and presumably in every case where it is still possible to provide 180 days, so order. The board answers, in effect, that the *Armstrong* dictum means that equity will interfere to prevent the loss of subsidy only when such loss will exceed the amount the district will not be required to pay for instructional expense and adduced proofs that the Northern Cambria School District would be required to raise less money locally by teaching 150 days and losing subsidy than by teaching 180 days, paying the teachers and receiving subsidy.[3] Again, both sides fall into error by losing sight of the public's interest in keeping school.

The plaintiff fails to observe the difference in the issues. In the case of suit for an injunction of a strike under the Public Employe Relations Act, the question

---

[3] Act of March 10, 1949, P. L. 30, §2501, as amended, 24 P.S. §25-2501.

is whether the strike endangers or threatens the general welfare. The loss of any money needed to support the schools, especially those closed by labor troubles, is clearly a threat to the general welfare and, as *Armstrong* suggests, could compel injunctive relief. The issue of the instant case is not whether the failure to obtain subsidy threatens the general welfare but whether the board abused its powers in deciding that the then extant educational program would be better served by observing holidays with loss of subsidy than by requiring daily sessions for six months. In the strike injunction case, the issue is school with subsidy or no school and no subsidy; in the class of case here before us, the issue is whether the board's plan for conducting school is a proper exercise of its powers despite loss of subsidy.

It is quite true, as the defendant contends, in this case (and as our calculations of the complex, ingenious reimbursement formula of the Public School Code show,[3] in almost all cases) that the local taxpayers will pay less for education by the system's teaching fewer than 180 days and paying teachers on the basis of days taught, than they will by providing 180 days; and this is so, regardless of whether the district is "rich," "average" or 'poor," as those terms are popularly used.[4] But

---

[3] Act of March 10, 1949, P. L. 30, §2501, as amended, 24 P.S. §25-2501.

[4] To describe the relative value of assessable real estate per school child.

The formula of Section 1501 were until June 28, 1973 applied by the Department of Education in a manner which caused a reduction of subsidy in each of the two years next succeeding the year in which there was a reduction in days taught. The reduction in the year first succeeding resulted from the reduction of the factor of "weighted average daily membership" and in the year second succeeding by a consequent reduction of the district's "aid ratio." By directive dated June 28, 1973, the Secretary of Education eliminated the second year's penalty. This action will further reduce

the Legislature has directed 180 days as its standard of time to be taught by a thorough and efficient school system. Not only may this standard not be sacrificed merely to avoid expenditure of money, the loss of full state subsidy obtainable by adherence to that standard is a factor to be weighed along with others in a case like the one before us. If the board were refusing to schedule a few days easily supplied it might well be decisive.

As we have noted, the loss of instruction time appears to have been the result of the combined effect of the teachers' insistence on bargaining on the school calendar in order to improve their salaries and the board's purpose of making the teachers suffer from the strike.[5]

If, in this case, a proper action had been brought when there were but seven days lost, the court might well have directed the board to revise its schedule to provide some or all of the lost instruction. But the court below was asked to direct the board to require the pupils to attend school every weekday for the balance of the school year. The effect of such a requirement upon the pupils, especially high school seniors preparing themselves financially and otherwise for college, and their families, needed no telling in the record. Nevertheless, the superintendent of schools gave as his opinion, which seems to us reasonable, that the education of the pupils, which, we repeat, is to be primarily

the financial impact of a strike on the districts, with what effect upon school board's bargaining practices remains to be seen.

[5] Indeed, the board seemed to believe and argues on these appeals that it would be unlawful for it to schedule lost days because the payment of salaries for such days would be violation of Section 1006 of the Public Employe Relations Act, 43 P.S. §1101.1006, providing that "[n]o public employe shall be entitled to pay of compensation from the public employer for the period engaged in any strike." This contention is wholly without merit.

served in these matters, would not be furthered, but would indeed be harmed, by such a schedule. We find no abuse of the court's discretion in denying the relief requested under the circumstances and on this record.

Orders affirmed.

Judge KRAMER concurs in the result only.

DISSENTING OPINION BY JUDGE MENCER:

I respectfully dissent. Leaving aside, as does the majority, the significant procedural questions attendant to this case, I would not affirm on the merits. Unlike the majority, I find the case to be difficult.

We are here confronted with the task of endeavoring to reconcile certain attendance requirements of the Public School Code of 1949, Act of March 10, 1949, P. L. 30, 24 P.S. §1-101 et seq., with calendar limitations as a consequence of a disruption of the normal school schedule resulting from a strike of teachers under provisions of the Public Employe Relations Act, Act of July 23, 1970, P. L. 563, 43 P.S. §1101.101 et seq.

It seems to me that a complete reconciliation is impossible and that it is for the Legislature to reexamine this area of our law and make necessary amendments to the applicable statutes. Above all, I am convinced that this task of reconciliation is the responsibility and prerogative of the Legislature and is not for the courts, school boards or teachers. We should not be lulled by the temptation of practicality to work out or approve solutions to the specific time problems concerning when and for how long schools will be opened for the purpose of instructing students.

These general observations lead me to a conclusion in this case which is different from that reached by the majority. I would apply the School Code provisions and reach the result that the Northern Cambria School District should have continued to hold classes on a

Monday through Friday schedule until June 29, 1973, which would have been the last permitted day for school to be open during the school year in question. My reasoning is as follows:

(1) In all school districts of the second, third and fourth classes, the school year shall begin on the first Monday of July of each year.[1]  24 P.S. §4-401(b).

(2) All schools shall be kept open each school year for at least one hundred eighty (180) days of instruction for pupils.  24 P.S. §15-1501.

(3) No school shall be kept open on any Saturday[2] for the purpose of ordinary instruction, except when Monday is fixed by the board of school directors as the weekly holiday, or on Sunday, Memorial Day, Fourth of July or Christmas, or during the time of holding the teachers' institute for such district.  24 P.S. §15-1502.

(4) The board of school directors of each school district shall fix *the date of the beginning* of the school term.  24 P.S. §15-1504.

It is of considerable importance that the board of school directors is given the discretion of fixing the date of the beginning of the school term but it is not given any discretion over fixing the date of the ending of the school term.  It is this single truth that separates me from the majority here.  The majority concluded that the Northern Cambria School District School Board had acted reasonably under the circumstances and

_____

[1] It seems to me many of the time problems common to cases of this nature could be eased by the Legislature's redefining the school year as beginning on the first Monday of September of each year, assuming the desirability of a summer vacation.

[2] The majority discusses appellant's request that pupils be required to attend school *every week day* for the balance of the school year, without mention of the prohibition against schools being kept open on Saturdays.

within its discretion in holding to the June 1, 1973 closing date originally fixed. I view the Board as having no discretion as to establishing the *last day* of school but as having discretion only in regard to the *first day* of school. Once school is under way for the school year, the School Code specifically requires 180 days of instruction, not including Saturdays, Sundays, Christmas, Memorial Day, Fourth of July or those days during which teachers' institute is being held.

Therefore, I conclude that, since thirty (30) instruction days were lost because of the school strike which lasted from August 29, 1972 until October 12, 1972, the School Code required that twenty (20) of those lost days be made up during the month of June, 1973.[3] Specifically, school should have been held Monday through Friday during the four weeks in June, 1973 following the June 1, 1973 closing date fixed initially by the School Board.

This, of course, might not be a complete reconciliation of the various attendance provisions, but it would provide the maximum instruction time within the school year in accord with the School Code and the reality that a legally permitted strike of teachers had resulted in a loss of thirty days of instruction.

I join with the apt observation of my colleague, Judge KRAMER, alluded to by the majority, that in these cases the school children are "pawns in an adult game of economics." As the majority correctly notes, the effect of requiring pupils to attend school for the balance of the school year is inconvenient and unfair, financially and otherwise, to the pupils and their families.

---

[3] This assumes that no more than ten (10) days would have been made up prior to June 1, 1973 by the elimination of normal holiday vacation periods.

Nevertheless, that is what the law now requires, and the Legislature, not the courts, should alleviate and correct this inequity which has resulted from the superimposing of the right of school teachers to strike on the specific and mandatory attendance requirements of the School Code.

Judge BLATT joins in this dissent.

---

DISSENTING OPINION BY JUDGE BLATT:

I believe that this appeal was moot and should have been dismissed as such.

Inasmuch, however, as the majority has chosen to consider and decide this case on its merits, I will join in the dissent of Judge MENCER.