548 A.2d 1202

The JERSEY SHORE AREA SCHOOL DISTRICT, Appellee,

v.

JERSEY SHORE EDUCATION ASSOCIATION, Pennsylvania State Education Association and All Classroom Teachers and Professional Personnel Employed by the Jersey Shore Area School District Who are Members of the Pennsylvania State Education Association and/or the Jersey Shore Education Association, Appellants.

Supreme Court of Pennsylvania.

Argued May 10, 1988.

Decided Oct. 17, 1988.

William A. Hebe, Wellsboro, for appellants.

Paul W. Reeder, Williamsport, for appellee.

Alan C. Blanco, Louis B. Kushner, Stephen H. Jordan, William P. Bresnahan, Pittsburgh, for amicus curiae Pa. Fed. of Teachers.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

OPINION OF THE COURT

STOUT, Justice.

This appeal is brought by the members of the Jersey Shore Education Association, which represents the teachers

of the Jersey Shore Area School District.[1] In it we are asked to reconcile that provision of the Public Employees Relations Act (PERA), 43 Pa.Stat.Ann. §§ 1101.101–.2301 (Purdon Supp.Pamph.1988), which gives teachers the right to strike,[2] with that provision of the Public School Code, 24 Pa.Stat.Ann. §§ 15–1501 to 16–1613 (Purdon 1962 & Supp. 1988), which mandates that school districts provide 180 days of pupil instruction. Specifically, PERA provides:

> If a strike by public employes occurs after the collective bargaining processes set forth in Sections 801 and 802 of Article VIII of this act have been completely utilized and exhausted, it shall not be prohibited unless or until such a strike creates *a clear and present danger or threat* to the health, safety or welfare of the public.

43 Pa.Stat.Ann. § 1101.1003 (Purdon Supp.Pamph.1988) (emphasis added). On the other hand, the Public School Code provides: "All public kindergartens, elementary and secondary schools shall be kept open each school year for at least one hundred eighty (180) days of instruction for pupils." 24 Pa.Stat.Ann. § 15–1501 (Purdon 1962 & Supp. 1988).

On September 10, 1984, after only four days of pupil instruction, the teachers struck against appellee, Jersey Shore Area School District.[3] On October 8, 1984, the school district filed for an injunction in the Court of Common Pleas of Lycoming County, in an effort to force the teachers back to work. A hearing was held on October 10, 1984, following which the Chancellor issued an injunction ordering the

1. The Pennsylvania Federation of Teachers has filed an *amicus curiae* brief in support of the teachers.

2. In enacting this legislation, Pennsylvania became but the second state to recognize the right of public employees to strike. This recognition came upon the heels of illegal strikes which precipitated similar enactments in many other jurisdictions as legislatures sought to control and limit illegal strikes. *See generally* Comment, *Striking a Balance in Bargaining with Public School Teachers,* 56 Iowa L.Rev. 598 (1971); Comment, *Public Employees: No Right to Strike,* 38 Tenn.L.Rev. 403 (1971).

3. The Pennsylvania School Boards Association has filed an *amicus curiae* brief in support of the school board.

teachers back to work on October 11.[4] The Association filed for reconsideration and an additional hearing was held on October 23, 1984. The Chancellor refused to lift the injunction. The Association appealed to the Commonwealth Court, which affirmed *solely* on the basis of the Chancellor's finding that the school district's impending inability to schedule 180 days of instruction presented a clear and present danger to the public because of a threatened loss of state subsidies. 99 Pa.Commw. 163, 512 A.2d 805 (1986). *See School District of Pittsburgh v. Commonwealth Dept. of Educ.*, 492 Pa. 140, 422 A.2d 1054 (1980). While we disagree with the Commonwealth Court that the threatened loss of state subsidies alone would support the issuance of an injunction, we nonetheless affirm on the record as a whole.

■ We must first address the issue of mootness. Because the teachers have long since returned to the classroom, this appeal is technically moot. Yet, the issue it raises is one of important public interest, capable of repetition, which is apt to elude review. Therefore, we shall entertain this appeal. *See, e.g., Wiest v. Mt. Lebanon School Dist.*, 457 Pa. 166, 169 n. 1, 320 A.2d 362, 364 n. 1, *cert. denied*, 419 U.S. 967, 95 S.Ct. 231, 42 L.Ed.2d 183 (1974). *Compare Commonwealth v. Joint Bargaining Comm.*, 484 Pa. 175, 398 A.2d 1001 (1979) (signing of new contract rendered appeal moot).

Next we turn to the standard of review accorded decisions by an equity court. Myriad cases have long emphasized that it is narrow. *Scientific Living v. Hohensee*, 440 Pa. 280, 270 A.2d 216 (1970), *cert. denied*, 402 U.S. 1012, 91 S.Ct. 2189, 29 L.Ed.2d 435 (1971); *Shapiro v. Shapiro*, 424 Pa. 120, 224 A.2d 164 (1966), *overruled on other grounds*, *Butler v. Butler*, 464 Pa. 522, 347 A.2d 477 (1975); *Steinmeyer v. Siebert*, 190 Pa. 471, 42 A. 880 (1899). Ordinarily,

4. At the conclusion of the hearing, after the Chancellor announced his intention to order the teachers back to work on October 15, 1984, the teachers indicated they would return to the classroom voluntarily on October 11. The Chancellor thereupon amended his decision so as to require the teachers to return to work on October 11.

a Chancellor's findings of fact will not be disturbed absent "an abuse of discretion or a capricious disbelief of the evidence or a lack of evidentiary support on the record for such findings." *Shapiro,* 424 Pa. at 127, 224 A.2d at 168. A Chancellor's conclusions of law bear stricter scrutiny, *see id.,* 424 Pa. at 127, 224 A.2d at 168. This Court has stated that it will not reverse a grant of injunctive relief "unless ... the rules of law relied on are palpably wrong or clearly inapplicable." *Lindenfelser v. Lindenfelser,* 385 Pa. 342, 343–44, 123 A.2d 626, 627 (1956) (citations omitted). Bearing in mind this standard of review, we turn to the evidence.

At the first hearing the superintendent for the school district testified that he had prepared a revised school calendar. Allowing for six snow days [5] and two nonmandatory holidays,[6] the superintendent had concluded that October 15, 1984, would be the last date upon which the teachers could return to the classroom while still ensuring an educationally-sound schedule. In addition, the superintendent testified extensively as to the financial impact of the strike. He stated that the school district stood to lose $26,637.00 per day in state subsidies for each day it fell short of 180 days of instruction. At the time of the hearing the superintendent estimated that the strike had cost the school district $65,944.00 in unemployment compensation, additional salaries and other costs incidental to the strike.

With respect to the students, the superintendent stated that the strike placed the seniors at a competitive disadvantage in terms of SAT testing. Seniors also faced deadlines with respect to scholarship applications and were bereft of

5. The superintendent allowed for six snow days because an official at the Department of Education informed him allowance had to be made for the same number of such days as had been needed in the previous year. Six such days had been needed in the academic year preceding the strike. At the second hearing, the superintendent further explained that he scheduled these days because the geographic make-up of the district rendered it more prone to declaring snow days.

6. The superintendent allowed for these additional holidays because they fell on Mondays preceding Christmas and New Years. In the superintendent's opinion, it would have been educationally unsound to require the students to attend classes sandwiched between Sunday and these statutorily-mandated holidays.

guidance counseling services. The longer the strike, the more deleterious its effect on the future of the seniors.

With respect to other grades, students would be at a competitive disadvantage in taking state-mandated tests to determine remedial needs. With only four days of instruction, some students could be placed in remedial courses which they would not otherwise have needed. Moreover, in the event the school district could not administer these tests due to the continuation of the strike, it would lose state funding for the remedial courses themselves.

The superintendent stated that interference with a regular pattern of study, as had occurred in this strike, results in a loss of learning capacity, which increases with the length of the interruption. In support of this hypothesis he cited test scores from a previous year showing a drop in student aptitudes following a strike.

Finally, the superintendent expressed his concern that the strike deprived eligible students of a free, hot lunch, possibly the only such meal they received, while working parents were experiencing difficulties with interim babysitting arrangements.

The school teachers presented the testimony of two experts. The first disputed the superintendent's interpretation of prior test scores insofar as their reflecting a decrease in pupil learning due to the previous strike. This expert opined that it was inappropriate to compare different student groups for such a purpose. The second expert testified that, as of the date of the hearing, the school district would actually have a net savings in salaries and benefits of $24,199.00 over the potentially lost subsidy.

Having heard this evidence, the Chancellor issued the injunction on the basis of his conclusion that all of the evidence had demonstrated the existence of a clear and present danger to the health and welfare of the community.[7]

7. In announcing his decision to issue the injunction, the Chancellor referred primarily to the potential subsidy loss. His opinion, how-

At the reconsideration hearing, little additional evidence was presented except that two officials of the Department of Education testified as to departmental policy with regard to withholding subsidies and as to their calculations with regard to the last possible date upon which the teachers would have to return to the classroom in order to ensure a 180-day calendar.[8] Following this testimony, the Chancellor refused to lift the injunction.

Since this is an issue of first impression for this Court, we shall begin our legal analysis with a brief review of the decisions of the Commonwealth Court that have addressed it. In *Armstrong School Dist. v. Armstrong Educ. Ass'n*, 5 Pa.Commw. 378, 291 A.2d 120 (1972), Commonwealth Court grappled with the definition of "clear and present danger or threat" in analogizing it to First Amendment, free speech and association cases. *Id.* at 383, 291 A.2d at 123. The Court concluded:

> In this light, the determination of whether or not a strike presents a clear and present danger to the health, safety of welfare of the public must, therefore, require the court to find that the danger or threat is real or actual and that a strong likelihood exists that it will occur. Additionally, it seems to us that the "danger" or "threat" concerned must not be one which is normally incident to a strike by public employees. By enacting [PERA] which authorizes such strikes, the Legisature may be understood to have indicated its willingness to accept certain inconveniences, for such are inevitable, but it obviously intended to draw the line at those which pose a danger to the public health, safety or welfare.

*Id.* at 383–84, 291 A.2d at 124. In reversing the issuance of an injunction, the Court stated that the disruption of routine administrative procedures and the cancellation of extracur-

---

ever, makes it clear that he relied equally upon the evidence of harm to the students themselves.

8. Much ado has been made over whether, in light of this testimony, the operative cut-off date was October 17, 1988, or a few days later, thereby making the injunction premature. Our holding renders this myopic distinction immaterial.

ricular activities were inconveniences inherent in a teachers' strike, inconveniences envisioned by the legislature which, if considered a "clear and present danger or threat," would virtually nullify the right to strike. *Id.* at 385, 291 A.2d at 124. In *dicta* the Court also stated that if a strike lasted so long as to make the 180–day calendar an impossibility, and the cessation of subsidies a possibility, it properly could be enjoined.

In *Philadelphia Fed. of Teachers v. Ross*, 8 Pa.Commw. 204, 301 A.2d 405 (1973), the Court affirmed the issuance of an injunction where the board presented evidence of sharply increased gang activity that necessitated $133,000.00 per day in increased police protection, endemic student underachievement, possible loss of state subsidies, and the disqualification of seniors from entering college. The Court opined:

It is neither possible nor prudent to state with precision that any one or more given circumstances surrounding a strike by school teachers will constitute a threat to the health, safety or welfare of the public. Nor do we decide that any particular number of days of lost instruction caused by a strike produces such a threat.

*Id.* at 215, 301 A.2d at 411. *See also Bethel Park School Dist. v. Bethel Park Fed. of Teachers*, 54 Pa.Commw. 49, 52, 420 A.2d 18, 19 (1980) (loss of state subsidies, instructional days, vocational job training, higher education and special education opportunities, counseling, social and health services, extracurricular programs and employees' work and wage opportunities constituted a clear and present danger to the community).

In *Bellefonte Area School Bd. v. The Bellefonte Area Educ. Ass'n*, 9 Pa.Commw. 210, 304 A.2d 922 (1973), the Court reversed the issuance of an injunction in concluding that the facts did not support a finding of "clear and present danger or threat." Since in that case sufficient make-up days remained to replace the thirteen strike days, therefore, the loss of state subsidies was not imminent. Moreover, the possible loss of participation in an educational quality assessment program was not deemed harmful

enough to justify the injunction. *See also Wilkes–Barre Educ. Ass'n v. Wilkes–Barre Area School Dist.,* 105 Pa. Commw. 165, 523 A.2d 1183 (1987), *appeal denied,* 516 Pa. 645, 533 A.2d 715 (1987) (issuance of injunction prohibiting selective strikes resulting in only short periods of lost instruction yet possibly usurping school district's managerial prerogatives, reversed for insufficient evidence of a threat or danger to the students' health, safety or welfare). In a vigorous concurring opinion, Judge Kramer inveighed in *Bellefonte:*

All of the parties to this case and the majority opinion blithely speak of using "summer vacations" or holidays as a means of making up teachers' strike days to preserve state education subsidy funds. Not one word of concern is expressed for those school students who work on holidays and vacation days to stay in school. Not one word is utilized to protect high school seniors who must attend college summer school to gain admittance to college in the fall. Not one word is devoted to what happens if high school senior's grades are not ready for timely submission to college for the fall admission. Not one word is said because the school children are not represented. They are pawns in an adult game of economics. If the teachers and the school district agree to use all legal holidays, all weekends and all vacation time to make up for the lost days of a strike, does that mean the students will have no rest? Do they have any rights?

9 Pa.Commw. at 220, 304 A.2d at 926 (Kramer, J., concurring).

In *Bristol Twp. Educ. Ass'n v. School Dist. of Bristol,* 14 Pa.Commw. 463, 322 A.2d 767 (1974), although the findings of fact reflected lost educational programs, lost salaries, lost community programs and services, disadvantages for college-bound seniors, the deprivation of free lunches to students, and difficulties for working parents, the Court affirmed the enjoining of a twenty-six day strike *solely* because the Court determined that the potential loss of

state subsidies created a danger or threat to the health, safety or welfare of the public.

More recently, in *Scanlon v. Mount Union Area Bd. of School Directors*, 51 Pa.Commw. 83, 415 A.2d 96 (1980), *aff'd*, 499 Pa. 215, 452 A.2d 1016 (1982), Commonwealth Court held that the scheduling of 180 days by school districts was mandatory, not discretionary, while stating in *dicta* that:

> We are aware that strike activity might *lawfully* continue for such a period as to render the provision of 180 instructional days impossible within the terms of the Code defining the school year; in that event, boards must amend their schedules to comply as fully as is possible within the applicable school year.

*Id.* at 92, 415 A.2d at 100 (emphasis added).

Finally, in *Armstrong Educ. Ass'n v. Armstrong School Dist.*, 116 Pa.Commw. 571, 542 A.2d 1047 (1988), Commonwealth Court, citing the case *sub judice*, affirmed the issuance of an injunction where a strike threatened to foreshorten the 180–day instructional calendar.

 This brief history reflects judicial difficulty, and at times divergence, in reconciling the right to strike with the requirement of 180 instructional days. While some cases have looked at a plethora of factors, including the loss of state subsidies, others have looked only at the loss of state subsidies in determining that it *per se* creates a clear and present danger or threat. We do not believe that the language of PERA necessitates judicial hand-wringing or hair-pulling. We hold that the loss of state educational subsidies for failure of a school district to schedule 180 days of instruction for pupils, alone, does not constitute a "clear and present danger or threat to the health, safety or welfare of the public." [9] In this case the school district

9. We resist the facile temptation to legislate judicially a 180–day limit to the teachers' right to strike. We leave it to the legislature, well aware of the requisites of the Public School Code when it enacted PERA, to decide whether such a limit should be imposed. Until that time, we shall consider the length of the instructional calendar and

demonstrated beyond peradventure the existence of a "clear and present danger or threat to the health, safety or welfare of the public." Without focusing on any one of the myriad economic and other facts upon which the school board relied, without weighing the interests of seniors as weightier that those of kindergartners, we conclude that, in conjunction, these factors created a school district which, although perhaps able to "make up" a day or two of instruction, could not "make up" the actual, the impending and the ever-increasing harm which was being wrought upon its students. On this record, the health and welfare of the students, who cannot and must not be treated as a category separate from the public at large, was clearly endangered and threatened.[10]

The order of the Commonwealth Court is affirmed.

LARSEN, J., files a dissenting opinion in which PAPADAKOS, JJ., joins.

ZAPPALA, J., files a dissenting opinion.

LARSEN, Justice, dissenting.

When the legislature granted school teachers and other public employees *the right to strike* in 1970, it was fully cognizant of the provisions in the Public School Code mandating that school districts provide 180 days of pupil instruction and fully aware that such strikes could infringe upon the 180 day mandate. Nevertheless, the legislature

the loss of state funding as but one factor in the proper issuance of an injunction.

**10.** It is interesting to note that, even when addressing the issue of the loss of state subsidies, both lower courts focused upon the economic harm to the school district rather than the harm to the more than three thousand students in the district. We are mindful of the words of Chief Justice Earl Warren, who in the landmark decision of *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), wrote for a unanimous Court almost twenty-five years ago: "[Education] is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Id.* at 493, 74 S.Ct. at 691.

granted that right to strike in Act 195 of July 23, 1970, *as amended*, 43 Pa.Stat.Ann. §§ 1101.101–.2301 (the Public Employees Relations Act, or PERA), and restricted the possibility of intervention by the courts in providing that a strike occuring after the collective bargaining procedures of Act 195 have been utilized and exhausted *"shall not be prohibited unless or until such a strike creates a clear and present danger or threat to the health, safety or welfare of the public."* 43 Pa.Stat.Ann. § 1101.1003. This legislative restriction on a court's authority to intervene by injunction against a strike is strong and explicit—a strike "shall not be prohibited" in the absence of a *"clear and present* danger or threat" to the public's health, safety or welfare. Surely, clear and present danger or threat to the health, safety or welfare of the community requires much more than the myriad inevitable *and expected* inconveniences and disruptions that are the normal consequences of any school strike, even one which impinges on the mandatory 180 days of pupil instruction of which the legislature was well aware.

In support, I adopt the opinion and analysis of the Honorable Emil E. Narick, then sitting on the Court of Common Pleas of Allegheny County, in *Bethel Park School District v. Bethel Park Federation of Teachers*, 135 Pgh.L.J. 127 (C.P.Alleg.Co.1986). In this case, Judge Narick refused to issue an injunction against a strike by school teachers despite the school board's recitation of the standard litany of ills caused by the strike, namely that state subsidies were threatened, that seniors were at a competitive disadvantage with college placement and testing, that students generally were competitively disadvantaged, that special programs were threatened, etc. Recognizing that these concerns, although serious and important, were not what was contemplated when the legislature gave courts the authority to issue an injunction *only when* there was a "clear and present danger or threat to the health, safety or welfare of the public," Judge Narick stated as follows:

[I]t seems to us that *the danger or threat concerned must not be one which is normally incident to a strike by public employees.* By enacting Act 195 which authorizes such strikes, the legislature may be understood to have indicated its willingness to accept certain inconveniences, for such are inevitable, but it obviously intended to draw the line at those which pose a danger to the public health, safety or welfare of the public.

The disruption of routine administrative procedures, the cancellation of extracurricular activities and sports and other such difficulties are most certainly inconvenient for the public, and especially for students and their parents. But these problems are inherent in the very nature of any strike by school teachers, or any other group of public employees. If we were to say that such inconveniences, which necessarily accompany any strike by school teachers from its very inception, are proper grounds for enjoining such a strike, we would in fact be nullifying the right to strike granted to the school teachers by the legislature in Act 195, as is granted to all other public employees.

The fact that students and teachers might have to remain in school later in June than originally planned may be unfortunate, of course, but again is merely an inconvenience inherent in the right of school teachers to strike, a right now guaranteed them by law.

\* \* \* \* \* \*

We are aware that the School District has presented evidence that it would suffer loss of substantial sums of money for the payment of nonstriking employees, maintenance costs, high school students being disadvantaged seeking admission to colleges, alleged testing program problems and other matters referred to in the Jersey Shore [*Jersey Shore Education Assoc. v. Jersey Shore Area School Dist.,* 99 Pa.Cmwlth. 163, 512 A.2d 805 (1986)] case by the trial court. However, as the Commonwealth Court decisions tell us, those types of harms do not necessarily constitute a clear and present danger

or threat to the public health or welfare requiring that a teachers' strike be enjoined because *each of these harms is an inconvenience which the legislature could reasonably have expected would ordinarily occur as a result of a strike by school teachers.*

Further, notwithstanding the Public School Code requiring 180 days instructions, our courts have held that strike activities can justify providing less than 180 instruction days when it renders scheduling impossible....

\* \* \* \* \* \*

In summary, I do not believe that where a teachers' strike prevents a school district from having 180 days of instruction in the school year with a consequence of possible loss of state subsidy, there is thereby a clear and present danger or threat to the health, safety or welfare of the public.

*If the contrary is true, then it would follow that any strike which infringes upon the 180–day requirement is infected with almost presumptive invalidity, and, two, the school board is assured that its position in negotiations at the bargaining table, whether fair or unfair, will prevail if only it can hold out long enough to encroach on the 180–day requirement. Nor does adding thereto the inherent inconveniences, disruptions and problems caused students, their parents and the public which inevitably flow from any strike by school teachers justify the enjoining of such a strike.*

We rejected any suggestion that would nullify the right to strike granted the school teacheis as public employees by the legislature, as it does to all other public employees. In my view, the evil, which is not the strike itself, which is permitted, nor the natural disruptions flowing therefrom, but it must be extremely serious and the degree of imminent danger extremely high before the court can utilize the extraordinary remedy of injunctive relief to terminate a strike specifically authorized by statute.

135 Pgh.L.J. at 132–34 (emphasis added).

In the instant case, as in the *Bethel Park* decision, there is no evidence on the record of *any* clear and present

danger or threat to the health, safety or welfare of the public other than evidence of the normal disruptions and inconveniences associated with any strike of public school teachers. These types of harms usually associated with a public school teachers' strike were not unknown or unimaginable when the legislature prohibited courts from interfering with such strikes unless or until a clear and present danger or threat to the public health, safety or welfare were presented, and the legislature could not have equated the former harm with the latter clear and present danger or threat. The record, therefore, falls far short of justifying the "extraordinary remedy" of injunctive relief prohibiting the continuation of the strike, and the Chancellor should be reversed.

Unfortunately, the majority opinion seriously undermines the right to strike granted school teachers and other public employees. In fact, the majority transforms the ordinary into the extraordinary and renders the right to strike almost illusory for, as Judge Narick observes, school boards will be able to negotiate with recalcitrance secure in the knowledge that, as soon as the magic 180 day period is actually or nearly threatened, the board will be able to trot out the standard laundry list of inconveniences and disruptions normally associated with any strike by school teachers to obtain an injunction. The long overdue and well justified advances in some public school teachers' careers conditions and salaries, which have come about only recently through Act 195 and the right to strike, may prove fleeting in light of today's majority opinion. I urge the legislature to take prompt action to preserve the hard fought gains of this Commonwealth's front line soldiers in the war against ignorance and anarchy.

PAPADAKOS, J., joins in this dissenting opinion.

ZAPPALA, Justice, dissenting.

I agree with the majority that the risk of loss of state educational subsidies due to a school district's failure to schedule 180 days of instruction for pupils is not a "clear

and present danger or threat to the health, safety or welfare of the public." But while the majority professes to resist any temptation to judicially legislate a 180–day limitation to the right to strike, it has in fact succumbed to that temptation. By focusing its attention on the inconveniences to the students which accompany the shortened duration of the school year caused by a teachers' strike, the majority has effectively created a per se rule that the inability to schedule 180 days of instruction constitutes a clear and present danger to the health, safety or welfare of the public.

The student inconveniences detailed by the superintendent for the school district are the inevitable consequences of a strike which continues for such a period of time that it affects the 180 day requirement. By sustaining the grant of a preliminary injunction on the basis that those student inconveniences demonstrate a clear and present danger to the public, the majority has insured that injunctions will issue when the duration of the strike threatens the 180 day requirement. The majority is careful to emphasize that the economic threat of the loss of state subsidies is insufficient in itself to warrant the issuance of an injunction. This distinction is of no consequence. A teachers' strike which lasts long enough to create that economic threat will always give rise as well to the student inconveniences which concern the majority.

I do not equate the inconveniences to students with a "clear and present danger or threat to the health, safety or welfare of the public." Nor do I agree with the majority that the health and welfare of the student is not a concern separate from the legislative concern for the public at large. The disruptive effect of a teachers' strike upon students is properly a matter for concern. In enacting the Public Employee Relations Act, (PERA), 43 P.S. §§ 1101.101–1101.-2301, however, the Legislature weighed the competing interests which would be affected by the legislation in favor of permitting teachers to strike.

The student population was directly affected by that legislation. But it was the clear mandate of the Legislature that a strike by public employes "shall not be prohibited unless or until the strike creates a clear and present danger or threat to the health, safety, or welfare of the public." 43 P.S. § 1101.1003. The public at large does not share the individualized and personalized concerns of the student population. Nor are the terms synonymous. Nevertheless, the majority superimposes student inconveniences upon public welfare. In doing so, the majority places student inconveniences in a preeminent position and relegates the teachers' right to strike to a secondary concern. This is contrary to the legislative intent.

Since the enactment of PERA, the inconveniences and disruption experienced by the students and school districts during a strike have been addressed in decisions by the Commonwealth Court. See *Armstrong Education Association v. Armstrong School District*, 5 Pa.Commw. 378, 291 A.2d 120 (1972); *Bellefonte Area School Board v. The Bellefonte Area Education Association*, 9 Pa.Commw. 210, 304 A.2d 922 (1973); *Root v. Northern Cambria School District*, 10 Pa.Commw. 174, 309 A.2d 175 (1973); *Bristol Township Education Association v. School District of Briston Township*, 14 Pa.Commw. 463, 322 A.2d 767 (1974); *Commonwealth ex rel. John Pittenger, Secretary of Education, et al. v. Leechburg Area School District and the Pennsylvania Education Association*, 19 Pa.Commw. 140, 339 A.2d 149 (1975); *Scanlon v. Mount Union Area School District Board of Education, et al.*, 51 Pa.Commw. 83, 415 A.2d 96 (1980); *Bethel Park Education—Bethel Park School District v. Bethel Park Federation*, 54 Pa.Commw. 49, 420 A.2d 18 (1980). Notwithstanding these cases, the Legislature has never taken any action since PERA's enactment in 1970 to amend the statute so as to circumscribe the plain meaning of the word *public*.

Although the Legislature's inattention to student inconveniences may be perceived by some as a failure, the remedy properly rests with the Legislature. I, for one,

would not judicially disrupt the balance which the Legislature sought to achieve.