591 A.2d 1140

**TEMPLE UNIVERSITY—OF the COMMONWEALTH SYSTEM OF HIGHER EDUCATION**

v.

**TEMPLE ASSOCIATION OF UNIVERSITY PROFESSIONALS, AMERICAN FEDERATION OF TEACHERS LOCAL 4531, AFL–CIO, et al.**

**Appeal of TEMPLE ASSOCIATION OF UNIVERSITY PROFESSIONALS, AMERICAN FEDERATION OF TEACHERS LOCAL 4531, AFL–CIO.**

Commonwealth Court of Pennsylvania.

Argued March 6, 1991.

Decided May 2, 1991.

Reargument Denied July 10, 1991.

Alaine S. Williams, Walter, Willig, Williams & Davidson, Philadelphia, for appellants.

John B. Langel, with him, Maureen M. Rayborn, Suzanne E. Turner, and James H. Bocchinfuso, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, for appellee.

Before CRAIG, President Judge, and DOYLE, COLINS, PALLADINO, McGINLEY, SMITH and PELLEGRINI, JJ.

CRAIG, President Judge.

In this appeal, the Temple Association of University Professionals raises issues that relate to a preliminary injunction the Court of Common Pleas of Philadelphia County granted Temple University, that ordered Temple's striking professional employees back to work. The trial court and this court denied the Association's request for a supersedeas, 135 Pa.Cmwlth. 426, 582 A.2d 63, and this appeal followed.

However, because the parties indicated at oral argument that the cause of the dispute, the strike of the Association's members, has ended, we conclude that no controversy now exists. Hence, we will dismiss the appeal as moot.

## ORDER

Now, May 2, 1991, upon notification at oral argument by the parties in this case, that the strike which gave rise to this dispute has ended, the appeal of the Temple Association of University Professionals from the decision of the Court of Common Pleas of Philadelphia County, granting Temple University's request for a preliminary injunction ordering striking Association members back to work, is dismissed as moot.

COLINS, J., files a concurring opinion.

DOYLE, J., files a dissenting opinion.

COLINS, Judge, concurring.

I concur with the majority that the mootness doctrine should apply. However, I feel that this Court also lacks jurisdiction over this matter, because Temple University is not truly a "public employer."

Our Supreme Court's declaration that Temple University was a "public employer," pursuant to Section 301 of Act 195, in *Philadelphia Association of Interns and Residents v. Albert Einstein Medical Center*, 470 Pa. 562, 369 A.2d 711 (1976), would appear to have been dicta, as the basis of the Court's ruling was that the interns and residents in question were more truly students than employees.

The instant controversy, in my opinion, falls solely within the jurisdiction of the National Labor Relations Board, as Temple University's status as an employer is more analogous to that of the Pennsylvania State University, rather than that of a Commonwealth instrumentality.

DOYLE, Judge, dissenting.

Respectfully, I dissent. While I cannot quarrel with the majority's conclusion that settlement has rendered the instant controversy moot, I believe that the issue concerns one of great public importance and is capable of repetition yet evades review. Therefore, as our Supreme Court did in *Jersey Shore Area School District v. Jersey Shore Education Association,* 519 Pa. 398, 548 A.2d 1202 (1988), I would reach the merits.

I begin my analysis by first considering whether Temple University—of the Commonwealth System of Higher Education (Temple University) is a public employer within the intendment of Section 301 of the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, 43 P.S. § 1101.301 (Act 195). Although this question is not raised by the parties, it is jurisdictional in nature as Act 195 concerns the rights and responsibilities only of public employees and employers. Pursuant to Section 2(7) of the Temple University—Commonwealth Act, Act of November 30, 1965, P.L. 843, 24 P.S. § 2510–2(7), the legislature declared its intent "to extend Commonwealth opportunities for higher education by establishing Temple University as an *instrumentality of the Commonwealth* to serve as a State-related institution in the Commonwealth system of higher education." (Emphasis added.) Section 301 of Act 195 pertinently provides:

> "Public employer" means the Commonwealth of Pennsylvania, its political subdivisions including school districts and any officer, board, commission, agency, authority *or other instrumentality thereof* ... (Emphasis added).

In my view, therefore, Temple University falls within the Act 195 definition of public employer. *Accord. Philadelphia Association of Interns and Residents v. Albert Einstein Medical Center,* 470 Pa. 562, 369 A.2d 711 (1976) (Pennsylvania Supreme Court noted there was "no dispute" that Temple University is a public employer under Section 301 of Act 195, but since the issue is jurisdictional the Court presumably would have raised it sua sponte had it perceived a jurisdictional defect).

Turning now to a general examination of Act 195, a brief review of its purposes is helpful. The Act's purpose as enunciated in Section 101, 43 P.S. § 1101.101, is "to promote orderly and constructive relationships between all public employers and their employes subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare." To this end the courts have held that Act 195's primary objective is to establish a harmonious and fair working relationship which inures to the benefit of the Commonwealth's citizens but also protects public employees. *Kapil v. Association of Pennsylvania State College and University Faculties*, 504 Pa. 92, 470 A.2d 482 (1983). Further, we have admonished that Act 195 should not be strictly interpreted in the light of decisions which interpret *private* sector labor law, although such decisions may be examined for guidance. *McCluskey v. Department of Transportation*, 37 Pa.Commonwealth Ct. 598, 391 A.2d 45 (1978). Thus, consideration of the Act's public policy statement and the law interpreting that statement lead to the inevitable conclusion that it is the rights of the public, not of the employers or employees which are paramount.

Now that these general principles are established, a brief review of the genesis of this litigation is necessary. The case began when on September 26, 1990, Temple University filed a complaint in equity in the common pleas court seeking to enjoin striking faculty members represented by the Temple Association of University Professionals (TAUP) from continuing in a strike that they had begun on September 4, 1990. Temple University had advised TAUP that unless striking faculty members returned to work by October 2, 1990, their classes would be cancelled and they would not recover their full salary. On October 2, 1990, the trial court granted the preliminary injunction and ordered the teachers back to work. This appeal ensued.

The basis for Temple's complaint in equity and for the trial court's decision was Section 1003 of Act 195, 43 P.S. § 1101.1003. That Section pertinently provides as follows:

If a strike by public employes occurs after the collective bargaining processes set forth in sections 801 and 802 of Article VIII of this act have been completely utilized and exhausted, it shall not be prohibited unless or until such a strike creates a clear and present danger or threat to the health, safety or welfare of the public. In such cases the public employer shall initiate, in the court of common pleas of the jurisdiction where the strike occurs, an action for equitable relief including but not limited to appropriate injunctions and shall be entitled to such relief if the court finds that the strike creates a clear and present danger or threat to the health, safety or welfare of the public.

The question here is whether on the facts as found by the trial court there existed a clear and present danger or threat to the welfare of the public.[1] "Clear" has been interpreted to mean that the threat or danger is real or actual, not speculative or imagined. *Armstrong School District v. Armstrong Education Association,* 5 Pa.Commonwealth Ct. 378, 383–84, 291 A.2d 120, 123–24 (1972) (quoting *Communist Party of the United States v. Subversive Activities Control Board,* 223 F.2d 531, 544 (D.C.Cir. 1954), *reversed on other grounds,* 351 U.S. 115, 76 S.Ct. 663, 100 L.Ed. 1003 (1956)); *Jersey Shore.* "Present" means that which exists as opposed to that which does not yet exist or has ceased to exist. *Armstrong (quoting Communist Party ).* Present is not restricted to the "climatically imminent." *Id.* Further, the danger or threat must not be one normally incident to a strike by public employees. *Armstrong. Armstrong* also explains that by its passage of Act 195 the legislature indicated a willingness to accept the inevitable inconveniences which are attendant to a strike by public employees but it drew the line at those inconveniences which pose an actual danger to the health, safety or welfare of the public.

---

**1.** No argument is made here that the health or safety of the public was threatened or endangered.

Keeping these principles in mind, a recitation of the trial court's findings is next necessary.

The trial court found:

1. The ongoing strike at Temple University affects 29,-000 registered students, both graduate and undergraduate, and has resulted in the cancellation of 1,900 of the 4,700 classes taught by teachers in the TAUP Bargaining Unit.

2. Of the 29,000 students mentioned above, nearly 80% (23,000) do not have a full course load at present.

3. Half of the students are missing two or more classes (representing 40% to 60% of their credits) with the result that they no longer qualify as full-time students.

4. Six thousand students have no classes whatsoever.

5. Among undergraduates, 1,800 have no classes.

6. 17,000 undergraduates do not have a complete roster.

7. One-third of the freshman, that group of students most susceptible to drop-out, are missing three or more classes (i.e. 60% or more of their credit hours). Currently 25% of first-year students do not return to Temple for their sophomore year.

8. Only 402 main campus freshman (10%) have all of their classes.

9. Only 30% of the classes for graduate students are meeting.

10. Cancellation of those graduate courses not presently meeting would leave 60% of the graduate students with no classes; 80% would be missing at least one class (or 20% of their work).

11. 200 graduate students on research/training grants face the potential loss of their stipends and/or tuition support for this semester if the strike continues.

12. There is a possibility that research grants awarded to Temple for faculty research are in jeopardy if the strike is protracted to the end of the current semester.

13. The median family income of Temple students is $30,000/year.

14. Approximately one-half of the undergraduates receive financial aid in the form of a grant or loan or both.

15. In the present academic year it is expected that Temple students would receive 5,500 PELL grants, over 5,600 PHEAA grants, and over 2,600 other awards.

16. In the case of PELL grants, full-time students (12 credits or more in a semester) receive $1,150 each semester. The amount of the grant is reduced as less credit hours are taken, and a student who takes fewer than six credits receives $0.

17. In the case of PHEAA awards, only students who maintain their full-time status are eligible for an award.

18. If the strike continues and classes not yet meeting this fall are cancelled, an estimated $3,525,552 in state, federal, and university grants to students will be lost.

19. Employment is essential for many Temple students to pay their tuition and support themselves. Two-thirds of the undergraduates work more than 10 hours per week, and nearly half of these work more than 20 hours.

20. Those students with the greatest financial need would have the greatest difficulty in developing work schedules if classes were held on weekends.

21. Since many of these students work late afternoons and evenings, it would be impracticable for them to extend the school day.

22. For many students and faculty, it is not feasible to hold classes on Saturday and Sunday because of religious obligations.

23. Due to the pressures of assimilating large quantities of academic information in a short period of time, it would be wholly counter-productive and detrimental to the educational interests of students to attempt to compress a semester of work into an abridged time frame. The burden of any effort to do so would fall most heavily upon the academically unprepared. According to the official school calendar entered into evidence as Plaintiffs' Exhibit # 2, the only way to make up lost strike days would be to hold school every week day from now

until the beginning of the 1991 semester, save brief respites for Christmas, Thanksgiving, and New Year's Day.

24. The core curriculum is in jeopardy, since many of the courses in the curriculum have not been meeting because of the strike. As a result students may be unable to satisfy prerequisites needed for enrollment in upper-level courses, thus delaying graduation for up to a year.

25. 1,100 seniors are supposed to graduate in January, 1991, and 2,000 more in May. If the strike continues, 800 of the 1,100 January applicants will not graduate on time.

26. Temple has excelled at bringing under represented groups into university faculties. The Future Faculty Fellow Program has become a national model for bringing talented members of minority groups into graduate school. There are more than 60 African–American and Latino graduate students pursuing advanced degrees in various fields at Temple. Many of these students are missing classes because their professors are on strike.

27. The College of Education has developed, in conjunction with the School District of Philadelphia, a program to certify teachers who speak Asian languages. This program is designed to meet the growing need in Philadelphia schools for teachers with such linguistic ability. The strike has put this program in jeopardy.

28. 50% of the graduates of Temple University School of Education enter the Philadelphia School District System as teachers. We particularly cite here Paragraphs 7A and B and Paragraph 8A, C, E. F and the Affidavit of Richard Englert (Plaintiffs' Exhibit # 44).

29. The College of Education promotes other community programs which are threatened by the strike. These include an Adult Education program, and a program designed to assist public school children in their studies.

30. The Commonwealth of Pennsylvania has declared that, as a matter of public policy, higher education opportunities should be made available to the public at reduced

cost, and that Temple University is the instrumentality through which this policy will be implemented.

31. Temple's total budget for a fiscal year is $497 million dollars. $153 million comes from tuition. Approximately $60 million comes from endowments and income. The remainder, some $284 million, is in the form of direct and indirect governmental or public funds in the form of a direct appropriation from the Commonwealth of $136 million, and the remainder in various grants and specialized subsidies. The Commonwealth has appropriated $136 million for Temple for the current year. Of the $153 million in tuition, approximately $60 million is in the form of government-backed student loans, an indirect form of governmental subsidy.

32. Given the median family income of Temple students, the Court takes judicial notice that a large portion of the remaining $93 million is the result of loans made to students and families by banks and other lending institutions. These loans will have to be repaid whether students attend classes or not.

33. If the striking teachers do not return to work immediately, a significant amount of Temple's tuition revenues will be lost.

34. The City of Philadelphia receives approximately $650,000–$700,00 each year in city wage taxes. These amounts are diminished if the striking teachers do not return to work.

While certain of these findings are challenged by the Union as being unsupported by the record or misinterpreting the record, it is unnecessary for my purposes to become involved in an examination of each finding because I would hold that as a matter of law the findings do not support the legal conclusion that a clear and present danger or threat to the public welfare existed. My view is based on several factors.

First, the fact that higher education in this Commonwealth is neither constitutionally nor statutorily mandated distinguishes the situation from cases involving public

school strikes in grades K through 12 (K–12 cases). While Section 2(7) of the Temple University–Commonwealth Act speaks of "improving and strengthening higher education [in the Commonwealth] by designating Temple University as a State-related University," this is a far cry from the language in Section 1327 of the Public School Code of 1949 [2] (School Code) which, with certain exceptions not relevant here,[3] mandates compulsory public school attendance at least from the age of eight until the age of seventeen. Second, the threatened loss of federal subsidies which was present in many K–12 cases due to the possibility that 180 instructional days might not be able to be completed, *see* Section 1501 of the School Code, 24 P.S. § 15–1501, is simply not present here.[4] I fully recognize that this factor alone is not a controlling one in assessing a clear and present danger. *Jersey Shore.* It is, however, *a* factor and in my view an important one. Other factors also not present in this case include student deprivation of hot lunches and disadvantage to seniors with respect to scholastic aptitude testing. Third, unlike public school children in grades K–12, individuals who attend an institution of higher education, can although it may be inconvenient to do so, go elsewhere. None of the students is compelled to attend Temple University. That is not to say that all institutions of higher learning are identical. Anytime when what one is purchasing is a "service" rather that a "good," there will be substantive differences in the "product" depending upon where it is obtained. But, I do not believe that, at least with respect to most students, the differences here would be so extreme that we could conclude that one could not obtain a comparable higher education elsewhere.

**2.** Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. § 13–1327.

**3.** Such exceptions include homebound instruction and private or parochial school instruction.

**4.** Any attempt to compare Section 1501 of the School Code with the Department of Education regulation 31.22, 22 Pa.Code § 31.22, is unpersuasive. The regulation provides that an academic year shall be 28 weeks, but then goes on to authorize "innovative calendar arrangements of less than 28 weeks...."

To be sure, the students, their families, and the geographic area which Temple University serves have suffered inconveniences. This is certainly regrettable, but I do not believe that the fact that one will need an extra semester to graduate due to cancelled classes or that some additional student loan debts will be incurred can be properly held to constitute a danger or threat to the welfare of the public.[5] Nor does the loss of tax dollars to the Philadelphia area constitute such a danger. These types of inconveniences are exactly the sort which normally flow from a strike and which, under *Armstrong,* cannot support a back-to-work order.

When a strike occurs, it is the consumers of that product or service who suffer most. But they cope—by doing without the product or service, by switching "brands" or by finding acceptable substitutes. This is not a K–12 case where a child's ability to graduate or to advance in keeping with his or her developmental skills is at issue. In institutions of higher learning adults of many ages, levels of ability, skills and backgrounds seeking higher education are matriculated into the same classes. This is not a case of garbage piling up on the streets posing an imminent threat of the outbreak of a contagious disease. This is not a case of police or fire personnel abandoning a duty to protect the public. It is a case of some adults having to choose between unpleasant alternatives, such as temporarily deferring their education, seeking that education elsewhere, adjusting their schedules, and adjusting short-term career goals. While I can certainly sympathize with those who have borne the brunt of the inconveniences posed by this strike, I am forced to conclude that the trial court committed error in granting the preliminary injunction.[6]

5. I disagree with TAUP when it asserts that the trial court improperly focused only upon the danger or threat to the consumers (students) rather than the public at large. The trial court's findings, in my view, do examine the impact upon the general geographic area in question, although I disagree with the conclusions reached by the trial court.

6. My position is limited strictly to the facts of this case. I do not mean to suggest that an injunction under Section 1003 of Act 195

could never be entered against a Commonwealth University's employees.